**U. S. CHEMICAL CORPORATION**
and
**U. S. Plastic Products Corporation,**
Plaintiffs,

v.

**PLASTIC GLASS CORPORATION,**
Defendant.

Civ. No. 193-54.

United States District Court
D. New Jersey.

June 20, 1956.

Stanton T. Lawrence, Jr., Rutherford, N. J., Pennie, Edmonds, Morton, Barrows & Taylor, New York City, by W. B. Morton, New York City, of counsel, for plaintiffs.

Klein & Klein, Newark, N. J., Kenyon & Kenyon, by W. Houston Kenyon, Jr., Francis T. Carr, New York City, of counsel, for defendant.

MEANEY, District Judge.

### Findings of Fact

1. Plaintiff, U. S. Chemical Corporation, a corporation incorporated under the laws of the State of New Jersey, is assignee of U. S. Letters Patent No. 2,-668,328, application for which was filed April 8, 1953, issued to Frank E. Porter on February 9, 1954. Plaintiff, U. S. Plastic Products Corporation, also a New Jersey corporation, is exclusive licensee.

2. Defendant, Plastic Glass Corporation, is a corporation incorporated under the laws of the State of New Jersey.

3. Plaintiffs bring this action alleging infringement by defendant of claims 1, 3 and 4 of the patent, 35 U.S.C.A. §§ 271 and 281; 28 U.S.C.A. § 1338(a). Defendant denies infringement, counterclaims for declaratory judgment of invalidity under the Federal Declaratory Judgments Act, 28 U.S.C.A. § 2201, and counterclaims for an injunction and accounting on the basis of alleged unfair competition. 28 U.S.C.A. § 1338(b).

4. The patent in suit is for the process of "Casting Patterned Plastic Sheets." The avowed object is to effect a "controlled orientation of pattern forming additives of cast synthetic resin sheet." This, in more comprehensible terms, is plastic sheeting containing a simulated mother-of-pearl design. The basic material used in this process is a syrup known as monomeric methyl methacrylate. Added to this is a polymerizing catalyst, and a pattern forming material, usually guanine crystals prepared from fish scales, which gives the final product its iridescent appearance. This combination is heated until the desired viscosity is obtained. Then discrete particles—i. e., particles that can act strictly on their own, each as an individual particle—of a selected mesh size and a desired quantity are added to the molding composition. These are described in claim 1 as being "discrete particles of solid material of such weight and bulk as to sink by gravity"; in claim 2 as "discrete solid substantially spherical particles of a composition to blend with liquid and of such weight and bulk as to sink by gravity"; and in claim 3 as "a plurality of transparent beads of a composition and to be at least partially melted at the temperature of the liquid material and of such weight and bulk as to sink by gravity." The principal type used and in contention is transparent beads of acrylic resin—polymerized methyl methacrylate balls, having a low molecular weight and melting point and being compatible with the molding composition, in form of a solid material. The mixture formed is agitated and then poured into sheet molds which are spaced to remove the excess air and adjusted to the desired thickness. The mold is then turned on its end —vertically—and placed in a controlled temperature bath. The solid particles, being of greater density than the syrup, sink to the bottom by gravity. The bath acts to polymerize the entire composition and is so controlled that the solid fragments will sink a substantial distance before the complete polymerization occurs. As the bead sinks it carries with it a glob of viscous resin containing the pattern-forming material. This action forms a distinctive pattern because of the orientation of the guanine crystals in the mass. The product of the complete polymerization process is a plastic sheet containing a pearl design. This process permits the production of various designs reproducible to the extent that there is sufficient similarity between sheets to allow economical manufacture of the end product desired.

5. The counterclaim asserts the usual grounds for invalidity, but because of the determination hereafter to be made it is necessary only to decide the issue of public use and sale of the patented process more than one year prior to April 8, 1953.

6. Frank E. Porter, the patentee of the process, is a chemical engineer and has spent all of his career working in the plastics field. He has been working with methacrylate resins since 1936, spending a large part of his time experimenting with pearl design sheeting. He had several false starts and one particularly bad setback some time during the period 1947–1949 when he used wax as the design-producing medium and obtained a very nicely designed material. However, after sale and manufacture into handbags it was discovered that the plastic "blushed containing absolutely white streaks" from absorption of moisture from the air.

7. Porter entered the employ of U. S. Plastic Products Corporation in Febru-

ary, 1951, primarily to set up operations for the casting of clear and smooth pearl methyl methacrylate sheeting. U. S. Plastic Products Corporation at that time was producing a methyl methacrylate molding powder in the form of spheroidal beads with a low molecular weight and melting point for use in dental plates—the very same material he has incorporated into his patent as the pattern-forming substance.

8. After a period of laboratory experiment, and on September 27, 1951, Porter produced a full size sheet of design pearl sheeting using substantially the same process described in the patent in suit. This sheet was delivered to Handbag Metal Specialties, Inc., a New York corporation, which made a test handbag for use in aging and control tests. What these tests consisted of is not apparent, but they seem to have been merely to let the handbag sit in one place to determine whether the design would fade out. There is some vague testimony that other sheets were similarly used and that is accepted as a fact.

9. Beginning in November, 1951, and thereafter, sales were made to Handbag Specialties—24 sheets in November, 20 sheets in December, and in January, 1952, 89 sheets were sold to the same company. In February, 1952, sale of the sheets was also made to two other manufacturers, Jewel Plastics Company and Rialto Button and Wood Products, the total number of sheets being 203. In March, 1952, sales were made to the same three customers of 240 sheets. In April, up until and including April 7, 89 sheets were sold. The price was computed not on the basis of a sheet as a unit, but on the basis of a pound as a unit, the price in all instances during this period except two being $2 per pound. The aggregate invoice amount was $15,734.25.

10. All of the evidence of experimental use comes from the oral testimony of the patentee, Frank E. Porter, and Samuel Brass, president and sole stockholder of U. S. Chemical Corporation and president of U. S. Plastic Products Corporation (the latter's testimony contained in a deposition presented in evidence without objection). Porter testified as to a number of so-called "tests" carried out during the critical period. The first test mentioned has been referred to in finding of fact number 8. The second was not a test of the process at all; it was simply a realization that a thicker sheet was necessary for the manufacture of ladies' handbags. The other tests referred to—on January 25, 1952, March 28, 1952, May 12, 1952 and June 5, 1952—ostensibly were to determine whether a controllable process had been discovered so that it was now possible to produce the same design in varying thicknesses of plastic sheets. This view, that the primary motive was experimental, cannot be accepted. At page 64 of the transcript Porter was asked by the plaintiff:

"Q. Now, Mr. Porter, these experimental runs that you are referring to in your notebook, were they experimental runs for the purpose of working out production controls?"

To which he answered:

"A. These things were all done because they were requested by the customer. Starting in this, we had no knowledge of how to do it and they were strictly experimental runs. The procedure being to make a test sheet and then to make the experimental run following the test sheet if it looked as if it would be acceptable to the customer."

The obvious and only inference is that a new design was desired and if a test sheet was approved by the customer, a sufficient quantity would be produced to satisfy his needs. This conclusion is bolstered by the testimony of Porter elicited on cross-examination that any run of more than five sheets was production and not experiment.

Also significant is the testimony of Brass that he, and it is assumed the trade in general, considered that a plastic which would stand up for five or six months was a satisfactory product; one that would be ready for commercial production and sale.

11. From the beginning of November, 1951, to the critical date, there was no evidence of systematic practice to follow up the sales. Only occasionally, when Brass happened to be in personal communication with a customer, did he inquire if the plastic sold was holding up satisfactorily. It is also significant to note that no records or evidence of continuing tests or experiments or their results were introduced in evidence.

12. Plaintiffs rely on testimony of the patentee, Porter, that during the period in question scrap loss was "terrific" in that out of 11,000 pounds of design pearl sheeting, 3,000 pounds had to be scrapped because of defects. This may indicate that some kinks existed in production controls, but does not tend to prove a primarily experimental purpose. Quite the contrary, the large volume turned out tends to indicate full scale production.

13. Porter, quite naturally, because of his previous failures, was apprehensive lest this process fail him and wished to be certain of the reproducibility of the pattern and the durability of the material. After serious consideration we are constrained to conclude that between September and December, 1951, plaintiffs were proceeding cautiously and with the primary purpose of experimenting, adopting a "wait and see" attitude. However, somewhere about the beginning of the new year they were satisfied with their product and their process. They then began production and sale, with primarily a profit purpose in mind—any experimentation was to affect production controls and was subordinate only.

14. There is no doubt of the sale and use by the public of the product of the patented process during the critical period under discussion. The plaintiffs have not established by full, unequivocal and convincing proof that the use and sale were primarily experimental, with only a subordinate commercial purpose.

15. Testimony was introduced as to the secret use of the patented process during the period in question. It is unnecessary to make any findings on this issue because of the conclusions reached hereinabove.

16. It is apparent that if the process described was in public use then the process described in each of the claims contained in the patent was in public use.

17. The allegations in the counterclaim alleging unfair competition are that the patent is a process patent and that the plaintiffs, knowing the scope of the patent, wilfully and maliciously intimidated and coerced customers and potential customers of defendant by threats of legal action, by way of action for patent infringement, against said customers if they continued to purchase or use plastic sheeting made by defendant, such course of conduct being deliberately calculated to destroy defendant's competitive position in the field.

18. The only testimony introduced relative to defendant's counterclaim alleging unfair competition was that of Brass. It is patent from a perusal of this testimony that defendant (plaintiff on the counterclaim) has not proved its case.

Conclusions of Law

1. This court has jurisdiction of this case and the parties.

2. The parties here have tacitly assumed that the court has jurisdiction over the counterclaim for unfair competition by virtue of 28 U.S.C.A. § 1338(b). This question has not been so facilely determined. We are, however, of the opinion that the parties' assumption was correct and that the claim under the patent law is substantial and related to the claim of unfair competition. Cutting Room Appliances Corp. v. Empire Cutting Machine Co., 2 Cir., 1951, 186 F.2d 997 (although the Cutting Room case may be distinguished from the case at bar by the fact that we here have a process patent, the difference appears to be insubstantial. See American Ball Co. v. Federal Cartridge Corporation, 8 Cir., 1934, 70 F.2d 579, 98 A.L.R. 665). See, also, Hurn v. Oursler, 1933, 289 U.S. 238, 53 S.Ct. 586, 77 L.

Ed. 1148; Telechron, Inc., v. Parissi, 2 Cir., 1952, 197 F.2d 757; Darsyn Laboratories v. Lenox Laboratories, D.C.D.N. J.1954, 120 F.Supp. 42, affirmed 3 Cir., 1954, 217 F.2d 648, certiorari denied 1955, 349 U.S. 921, 75 S.Ct. 661, 99 L. Ed. 1253. Compare Celite Corporation v. Dicalite Co., 9 Cir., 1938, 96 F.2d 242, certiorari denied 1938, 305 U.S. 633, 59 S.Ct. 101, 83 L.Ed. 407.

█ 3. The patent in suit, No. 2,668,-328, is invalid and void because of prior public use and sale. 35 U.S.C.A. § 102 (b).

Section 102 of Title 35 U.S.C.A. provides:

"A person shall be entitled to a patent unless * * *

"(b) the invention was * * * in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or

"(c) he has abandoned the invention * * *."

The history of this provision of the statute has been thoroughly canvassed. Electric Storage Battery Co. v. Shimadzu, 1939, 307 U.S. 5, 59 S.Ct. 675, 83 L.Ed. 1071; Metallizing Engineering Co. v. Kenyon Bearing & Auto Parts Co., 2 Cir., 1946, 153 F.2d 516, certiorari denied 1946, 328 U.S. 840, 66 S.Ct. 1016, 90 L. Ed. 1615, rehearing denied 1946, 328 U. S. 881, 66 S.Ct. 1364, 90 L.Ed. 1648. Suffice it here to say that its forefather is the first patent act.

█ One may, for the purpose of testing his invention to prove its success, use the process or machine which is the subject of that invention and sell the product of its operation. Electric Storage Battery Co. v. Shimadzu, supra, 307 U.S. at page 20, 59 S.Ct. at page 684; Elizabeth v. Pavement Co., 1877, 97 U.S. 126, 24 L.Ed. 1000; Penn Electrical & Mfg. Co. v. Conroy, 3 Cir., 1908, 159 F. 943. But if the use is primarily for the purpose of profit, with the experimentation being only incidental, for a period more than one year prior to the application for a patent, it comes within the prohibition of the statute. Smith & Griggs Manufacturing Co. v. Sprague, 1887, 123 U.S. 249, 8 S.Ct. 122, 31 L.Ed. 141; Wendell v. American Laundry Machinery Co., 3 Cir., 1918, 248 F. 698.

Plaintiffs contend that even though there was a commercial use of the process, the prohibition of the statute is not violated if the process was kept secret and if the public were unable to determine the process from the product which was being sold on the open market. They urge that the law in this circuit is as stated in the case of Peerless Roll Leaf Co. v. H. Griffin & Sons Co., 2 Cir., 1928, 29 F.2d 646, and not that enunciated by Judge Learned Hand in Metallizing Engineering Co. v. Kenyon Bearing & Auto Parts Co., 2 Cir., 1946, 153 F.2d 516, which expressly overruled the Peerless Roll case. It is sufficient to say here that this court agrees with the opinion of Judge Hand in the Kenyon case; to attempt to add anything to his remarks would be a useless endeavor. See, also, Huszar v. Cincinnati Chemical Works, Inc., 6 Cir., 1949, 172 F.2d 6.

4. Defendant's counterclaim for a declaration of invalidity is granted as to all of the claims contained in the patent.

5. Defendant's counterclaim for unfair competition is dismissed.

6. Plaintiffs' action is dismissed with costs.

Let an order be submitted.