ARTVALE, INC., Plaintiff,

v.

RUGBY FABRICS CORP. and Barmil Associates, Ltd., Defendants.

United States District Court
S. D. New York.

March 20, 1964.

Supplemental Opinion June 23, 1964.

Emanuel R. Posnack, New York City, for plaintiff.

Brumbaugh, Free, Graves & Donohue, New York City, James N. Buckner, Joseph D. Garon, New York City, of counsel, for defendants.

LEVET, District Judge.

This is an action for infringement of U. S. Patent No. 2,667,775 brought by the patent's present owner, Artvale, Inc., against Rugby Fabrics Corp. and its wholly-owned subsidiary, Barmil Associates, Ltd., two of Artvale's competitors in the manufacture and sale of knitted textiles. Defendants deny infringement and plead as affirmative defenses and counterclaims unfair competition and breach of an agreement entered into between the parties on October 26, 1959 in settlement of a prior action involving the same patent. The reply denies the material allegations of the counterclaims.

The case was tried to the court without a jury. After hearing the testimony of the parties, examining the exhibits, the pleadings, the briefs and the proposed findings of fact and conclusions of law, this court makes the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1. Plaintiff, Artvale, Inc., is a New York corporation having its principal place of business in the City, County and State of New York.

2. Defendant, Rugby Fabrics Corp., is a New York corporation having its principal place of business in the City, County and State of New York.

3. Defendant, Barmil Associates, Ltd., is a wholly-owned subsidiary of the defendant Rugby Fabrics Corp., with its principal place of business within the City, County and State of New York.

4. U. S. Patent No. 2,667,775 was issued on February 2, 1954 to Fredric L. Aibel and through assignments is presently owned by the plaintiff Artvale. The patent is hereinafter referred to as the Aibel patent.

5. On October 26, 1959, the plaintiff and the defendant Rugby Fabrics, in settlement of a prior action involving the Aibel patent, Artvale, Inc. v. Rugby Fabrics Corp., Civil 110–199 (S.D.N.Y.), entered into an agreement, which in pertinent part provided:

"(2) That * * * Rugby Fabrics Corp., [its] officers, directors, agents, employees, servants and those claiming rights under and through them, will discontinue forthwith the manufacture, use and/or sale, during the term of U. S. Patent No. 2,667,775 in suit, of the following netting material made on a warp or Raschel type knitting machine having a front bar and a rear bar: netting material made of diamond mesh fabric constructed according to Figure 4 of the said patent in suit, * * * the following formula, set forth in lines 53 and 54, column 6 of said patent, being one of the formulas for making said diamond mesh fabric:

"Chain I: 20, 00, 24, 44

"Chain II: 00, 02, 44, 42

\* \* \* \* \* \*

"(3) That the provisions of Paragraph (2) hereof shall not apply to other materials that do not have the specific structures set forth in Paragraph (2) hereof, it being agreed that diamond mesh fabrics made with one bar always knitting and one bar always laying in are among such other materials that do not have the specific structures set forth in Paragraph (2) hereof and Artvale agrees not to bring suit against * * * Rugby * * * for infringement, or otherwise involve them in litigation under the patent

in suit because of their making, selling or using such other materials.

"(4) Artvale agrees not to bring suit against * * * Rugby * * merely because of the similarity of appearance of the goods of Artvale and the goods of the other parties hereto, provided the other parties have not committed acts of unfair competition or patent infringement.

\* \* \* \* \* \*

"(10) That a judgment of infringement and decree against further infringement of said patent by * * * Rugby * * * shall be entered without further notice." (Deft. Ex. H)

6. The consent judgment, entered the same day, pursuant to paragraph 10 of the settlement agreement, provided:

"(2) That as to the defendant [Rugby] herein said Patent No. 2,667,775 is good and valid in law.

\* \* \* \* \* \*

"(4) That the defendant, its officers, directors, agents, employees, servants and those claiming any rights under and through it, be and hereby are enjoined and restrained from manufacturing, using or selling netting fabrics constructed specifically according to Figures 1, 2 and 4 of said patent." (Deft. Ex. I)

7. The phrase "being one of the formulas" was inserted into paragraph 2 to express the intent of the parties that the prohibition was from making the fabric illustrated in Figure 4 regardless of the knitting formula employed. (634–36) The agreement initially did not contain these words and they were inserted in response to an inquiry by Milton Kurz, President of Rugby Fabrics, as to whether he would be in violation of the agreement if he constructed a fabric as illustrated in Figure 4 by a formula other than that specified in paragraph 2. There was no intention to alter the prohibition from that existing prior to the insertion of the words "being one of the formulas."

8. In paragraph 3 the parties agreed that "diamond mesh fabrics made with one bar always knitting and one bar always laying in are among such other materials that do not have the specific structures set forth in Paragraph (2)." A fabric so defined was, at the time of the agreement, being manufactured by A & W Manufacturing Corp., a party to the settlement agreement, and is illustrated in Figure 2 of the Harris patent (Deft. Exs. F and Z), which at the time of the agreement had not yet been issued to A & W. (358)

9. The fabric structure of Figure 4 of the patent can be made by more than one knitting formula.

10. Figure 4 of the Aibel patent diagrammatically represents a fabric in a stretched but unfinished state, substantially as it appears while being knitted.

This finding is based on the description of Figure 4 contained in the patent specification at col. 3, lines 47–50, where Figure 4 is described as being "substantially like Fig. 2." Figure 2, in turn, is described as "showing the fabric elements in their stretched condition substantially as they appear while being knitted." Pl. Ex. 1, col. 3, lines 39–41.

Both the plaintiff's expert, Prof. Shinn, and defendants' expert, Prof. Efland, testified to the same effect. Prof. Shinn testified that Figure 4 illustrates a fabric not completely finished (56) and that there are differences between Figure 4 and the finished fabric. (90–91) Prof. Efland testified that Figure 4 represents a stretched but unfinished fabric.

Other statements in the patent specification (Pl. Ex. 1) confirm this fact. One of the objects of the patent is "to enable the production selectively either of a diamond or hexagonal netting construction during the knitting process, rather than during the finishing process after the product is removed from the machine." (id. at Col. 2, lines 34–38) A prior art method of knitting is distinguished in the Aibel patent specification as producing a fabric "as an irregular mesh, and assumes a regular hexagonal shape only

when stretched during a subsequent finishing operation, after the fabric is removed from the machine." (id. at Col. 1, line 54, to Col. 2, line 2) The specification describes the fabric resulting from use of the Aibel patent as "[t]he finished product is a locked symmetrical mesh, of lace-like appearance; and the product comes off the machine in finished shape." (id. at Col. 5, lines 42–44) The inventor, Fredric Aibel, testified that this referred to the fabric as it "comes off the machine and before it is put into a finishing process." (598)

While the inventor testified at the trial that Figure 4 was intended to illustrate the fabric "as it would appear in its end use" (614), equating this with a finished fabric, I cannot accept this testimony, especially in view of his unsatisfactory explanation of the other statements in the patent specification.

Lastly, this finding is based on the nature of the finishing process. Both plaintiff's and defendants' experts agree that the finishing process, consisting of heat-treating and stretching, can subtantially alter the appearance and mesh construction of the fabric, and, in fact, the meshes of a nylon fabric, such as those at issue here, can be finished to almost any shape. (176; compare Deft. Exs. D, G, AA, which are prior art finished fabrics) The plaintiff's and defendants' fabrics are very similar in the finished state, (compare Pl. Exs. 13 and 37, or Pl. Ex. 26) while substantially different in the unfinished but stretched state (compare Deft. Exs. C and Y). Since the Patent Office has granted a patent to the defendants, Deft. Ex. T, the differences cannot be based upon mere visual similarity in the finished product.

The mere fact that greige or unfinished goods are not sold for end use in the apparel or millinery trade does not require a holding that Figure 4 refers to a finished fabric. Quite obviously, there are many patents which have no direct reference to the commercial end product.

11. Figure 4 of the Aibel patent pictorially represents a fabric of diamond mesh configuration where the diamond is constructed, as follows: Two adjacent sides are open elongated loops (Pl. Ex. 11, at 31, 37) made by the same knitting bar and held together by a contracted loop. (id. at 32) The other two adjacent sides are unknitted thread sections, each composed of a thread from each knitting bar. (id. at 33, 29, 35, 35A) Each juncture point of the diamond is a contracted loop. (id. 28, 30, 32, 36) The complete diamond is formed during five courses and three wales of knitting. (See Appendix A)

12. The defendants' unfinished fabric is pictorially represented (Deft. Ex. AH and Pl. Ex. 31) by alternate horizontal rows of diamonds and hexagons. Three sides of the hexagon are formed as follows: One side of two unknitted thread sections wrapped around each other, one from each of the knitting bars (Deft. Ex. AH, 26c, 26b); another side of two unknitted thread sections overlapping each other (id. 29, 34) and the last side of an elongated loop which is partially contracted. (id. 27) The other three sides of the hexagon are formed as follows: Two sides are elongated loops, one from each of the knitting bars (id. 39A, 26A) and the third side a loop equal in dimension to the partially contracted loop. (id. 30A) The diamond is formed exactly as the hexagon with the exception that two loops (id. 32, 30) are contracted to a greater degree. (Pl. Ex. 31 is attached as Appendix B)

13. The defendants' fabrics in a stretched but unfinished state are not constructed according to Figure 4 of the Aibel patent. Compare Pl. Ex. 11 and Deft. Ex. Y with Deft. Exs. C, U and AH. The major differences are (1) the elongated loops forming one side of the polygon of the accused fabric are closed, rather than open, and are from different, rather than the same, knitting bar; (2) the unknitted thread sections forming two other sides of the polygon are parallel in Figure 4 and cross-over and wraparound in the defendants' fabrics; (3) the contracted loops in Figure 4 are all

of equal length while they are of different lengths in the defendants' fabric.

14. The defendants have failed to establish by a fair preponderance of the credible evidence that the court proceedings brought by plaintiff, including both the motion to punish for contempt, filed June 13, 1961, and this action, were brought in bad faith with an intention to harass the defendants.

15. On December 7, 1961, the plaintiff published in Women's Wear Daily, a trade publication, the following notice:

"The above patent has been the basis of a number of lawsuits brought by Artvale, Inc., against infringers.

"Each of these lawsuits has terminated with judgments in favor of Artvale, Inc.

"All of the defendants involved in these law suits have admitted the above-mentioned patent to be good and valid.

"The said Patent #2,667,775, is as strong and valid today as it has been from its inception.

"Artvale, Inc., will continue as vigorously as ever, to proceed against infringers in the maintenance of its legal rights under the patent." (Deft. Ex. P)

16. During March and April, 1962, after the institution of this action, the plaintiff sent letters to certain persons which read in part:

"Suit for patent infringement has been instituted against persons manufacturing a diamond mesh fabric violating our U. S. Patent #2,-667,775.

"Having ascertained that you are selling merchandise embodying such infringed fabric, we wish to make known that you are, perhaps unwittingly, a party to infringement of our patent. * * *" (Deft. Exs. R, S)

The plaintiff was unaware that any of these persons were customers of the defendants. (658)

## DISCUSSION

### I.

The initial question in this case is to determine to what extent, if any, did paragraphs 2 and 3 of the Settlement Agreement of October 26, 1959 narrow the scope of the Aibel patent as between these parties.

Quite obviously paragraph 3 of the agreement is a covenant not to sue in which the plaintiff agreed not to bring suit against the defendant for infringement, or otherwise involve it in litigation for the production of "other materials that do not have the specific structures set forth in Paragraph (2)." It seems beyond dispute that the parties intended to have paragraph 3 embrace certain infringing fabrics as to which the plaintiff has foregone its right to sue. Any other interpretation would render this portion of paragraph 3 a nullity by holding that Artvale would refrain from embroiling Rugby in litigation for the manufacture of non-fringing fabrics—a right Artvale quite obviously never possessed. By the force of paragraph 3, the parties narrowed as between themselves the scope of the Aibel patent so as to permit an action for infringement only if the fabric has "the specific structure set forth in Paragraph (2)." Therefore, before reaching any question of infringement, it must first be determined whether the defendant is producing fabrics which have the specific structure set forth in paragraph 2.

### II.

The prohibition of paragraph 2 reads:

"* * * netting material made of diamond mesh fabric constructed according to Figure 4 * * * the following formula, set forth in lines 53 and 54, column 6 of said patent, being one of the formulas for making said diamond mesh fabric:

"Chain I 20 00 24 44
"Chain II 00 02 44 42"

The crux of the prohibition is the knitted structure illustrated in Figure 4,

regardless of the knitting formula employed. One must reject the plaintiff's contention that the fabric defined in paragraph 2 of the agreement must be equated with that described in the patent specification and claims. The agreement unequivocally defines the prohibited fabric in terms of the patent drawings. Obviously, in drafting this agreement the parties were free to define the prohibition in any terms they wished. They could, for example, have agreed that the defendants be prohibited from infringing some or all of the patent claims in any manner. Or they could have defined the prohibited fabric in terms of the elements of the claims, or as defined in the specification: "[B]roader terminology was available to the parties had they chosen to use it." Artvale Inc. v. Rugby Fabrics Corp., 303 F.2d 283, 284 (2d Cir. 1962). They did not and the absence of any such prohibition is significant, presumptively arising from the relative strengths of the bargaining positions of the parties and the advantages and disadvantages of the agreed-upon prohibition. Were it the intent of the parties, as plaintiff contends, to reimpose the scope of the patent claims, they chose the least felicitous verbiage available.

Nor is the full scope of the patent imposed upon the parties by use of the words "being one of the formulas." The evidence establishes that this structure can be made by more than one formula. (See Finding of Fact No. 9) Initially, during the negotiations, the prohibition of paragraph 2 was limited to Figure 4 and a specific formula. The phrase "being one of the formulas" was later inserted to express the intent of the parties that the prohibition was to preclude the fabric illustrated in Figure 4 regardless of the knitting formula employed. (See Finding of Fact No 7.) The insertion of the phrase did not enlarge the basic prohibition.

The plaintiff is quite correct in contending that reference must be had to the specification in construing paragraph 2. But not however for the purpose of broadening the agreement. The only permissible reference to the specification in this factual context is to determine precisely what Figure 4 illustrates, as, for example, in determining that Figure 4 illustrates a stretched, but unfinished, fabric, see Finding of Fact No. 10. The agreed-upon prohibition is the knitted structure of Figure 4. The fact that at several places in the patent specification the inventor expresses his intent to include other forms of the fabric, see e. g., col. 6, lines 7–10; lines 56–58; col. 7, lines 16–20, is immaterial in determining the extent of the prohibition in paragraph 2. Similarly, in the normal patent case the scope of the invention is defined in the claims. In this case, however, an initial reference to the claims is prohibited by the language of paragraph 3 in which the plaintiff agreed not to bring suit for infringement save for fabrics having "the specific structure of paragraph (2)."

The conclusion that the prohibition of paragraph 2 is only as broad as the structure illustrated in Figure 4 regardless of the formula employed is supported by several other, albeit indirect, factors. The first of these is the definition inserted in paragraph 3 that "diamond mesh fabrics made with one bar always knitting and one bar always laying in are among such other materials that do not have the specific structures set forth in Paragraph (2)." It is not disputed that this specific exclusion of fabrics prohibited in paragraph 2 refers to a fabric as illustrated in Figure 2 of the Harris patent (Deft. Exs. F and Z) subsequently issued to A & W Manufacturing Co., a party to the agreement. A comparison of Figure 2 of the Harris patent and Figure 4 of the Aibel patent immediately reveals that the two differ only in the slightest manner by the method of being knit. The specific exclusion of a fabric so similar to the plaintiff's compels but one inference, that the prohibition of paragraph 2 is only the very identical structure of Figure 4.

Similarly, the use of the phrase "specific structures set forth in Paragraph (2)" in paragraph 3 indicates an intent upon the part of the parties that the pro-

hibition of paragraph 2 was the specific structure of Figure 4. Lastly, the language of the consent decree entered pursuant to paragraph 10 of the agreement prohibited "netting fabrics constructed specifically according to Figures 1, 2 and 4 of said patent." When required to construe this language on the contempt motion, both the district court and the Court of Appeals agreed that "only a fabric substantially identical to that pictured in the diagram could be said to be 'constructed specifically' according to Figure 2." Artvale, Inc. v. Rugby Fabrics Corp., 303 F.2d at 284. All of these factors combine to eliminate any interpretation broader than the fabric illustrated in Figure 4, regardless of the formula employed.

In determining whether a fabric is "constructed" according to Figure 4 of the Aibel patent, visual similarity is not determinative. The inclusion of a formula for making the fabric in paragraph 2, the exclusion of the Harris fabric in paragraph 3 which is visually similar to Figure 4 of the Aibel patent, and the wording of paragraph 4 all indicate that the prohibition of paragraph 2 must be tested by examining the knitted structure of the accused fabric.

There is no necessity to hold here, as there was on the contempt motion, that only substantial identity of each detail is prohibited. Quite obviously, the knitting formula may be altered and still produce the structure of Figure 4. However, a fabric to fall within the prohibition of paragraph 2 must have in the stretched but unfinished condition, at the least, the fundamental structure of Figure 4; that is, two sides of the diamond formed by open elongated loops from the same knitting bar, the other two sides formed by parallel unknitted float and lay-in sections with the junctures formed by single contracted loops.

### III.

■ The evidence is overwhelming that Figure 4 illustrates a fabric in the stretched, but unfinished, state, substantially as it appears while being knitted.

While the plaintiff premised its case of infringement on finished fabrics, see Pl. Exs. 3, 4, 26, 37, it is necessary to examine the structure of defendants' unfinished fabrics in a state approximating their condition while being knit to determine whether they are constructed according to Figure 4 of the Aibel patent. As Finding of Fact No. 13 demonstrates, they are not, and the complaint must be dismissed with costs. There is, accordingly, no necessity to pass upon the question of infringement.

### IV.

There remain only the two counterclaims asserted in the answer, the first for breach of contract; the second for malicious prosecution and unfair competition. Initially, the plaintiff challenges the court's jurisdiction to entertain the counterclaims. There is obviously no diversity.

■ The claim for breach of contract is a compulsory counterclaim and needs no independent basis of jurisdiction. Moore v. New York Cotton Exch., 270 U.S. 593, 46 S.Ct. 367, 70 L.Ed. 750 (1926). "Whether or not defendant's acts constituted an infringement is firmly linked to the question of defendant's rights under the agreement." King v. Edward B. Marks Music Corp., 56 F. Supp. 446, 449–450 (S.D.N.Y.1944). There is unquestionably jurisdiction over the claim for breach of contract. Equally obvious is the fact that the bringing of this action violates paragraph 3 of the agreement. Defendant is entitled to its damages for the breach.

The second counterclaim for malicious prosecution and unfair competition is set forth in paragraphs 18 and 19 of the answer:

"18. Knowing that it was precluded from bringing suit against the defendant, and knowing that defendant had not breached the consent judgment, the plaintiff knowingly, fraudulently and maliciously commenced the present suit and the proceedings in this Court for punishment for contempt entitled Artvale,

Inc. v. Rugby Fabrics Corp., Civil Action No. 110–199 in bad faith and solely for purposes of damaging the defendant's reputation and alienating defendant's customers, and said action has resulted in substantial damages to the defendant.

"19. Plaintiff knowing that it was precluded from bringing this suit against the defendant, and knowing that defendant had not breached the consent judgment, wrongfully, wilfully and in bad faith has threatened, and is now threatening defendant's customers with suit for patent infringement, and by such threats has caused many of defendant's customers to refrain from placing orders with defendant which they would normally have placed, whereby substantial damages have resulted to the defendant."

The defendant seeks to premise jurisdiction on 28 U.S.C. § 1338(b):

"(b) The district courts shall have original jurisdiction of any civil action asserting a claim of unfair competition when joined with a substantial and related claim under the copyright, patent or trademark laws."

■ While this jurisdictional statute has been held applicable to counterclaims as well as to the allegations in the complaint, Cutting Room Appliances Corp. v. Empire Cutting Mach. Co., 186 F.2d 997 (2d Cir. 1951), in each of the instances in which jurisdiction has been upheld the claim for unfair competition has been joined with a counterclaim seeking a declaratory judgment of invalidity or non-infringement. See, e. g., Cutting Room Appliances, supra; Zoomar, Inc. v. Paillard Prod. Inc., 152 F.Supp. 328 (S.D. N.Y.1957), aff'd 258 F.2d 527 (2d Cir.), cert. denied 358 U.S. 908, 79 S.Ct. 237, 3 L.Ed.2d 230 (1958); U. S. Chem. Corp. v. Plastic Glass Corp., 142 F.Supp. 840 (D.N.J.1956), aff'd 243 F.2d 892 (3 Cir.), cert. denied 355 U.S. 836, 78 S.Ct. 59, 2 L.Ed.2d 47 (1957); General Cellulose Co. v. Whitestone Prod. Co., 20 F.R.D. 101 (E.D.N.Y.1956). That is absent here and since 28 U.S.C. § 1338(b) is merely a codification of the pendent jurisdiction doctrine of Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933), there is in effect nothing to which the unfair competition claim can be pendent. The defendants' request to amend their answer to request a declaratory judgment is denied at this late stage of the litigation. The court, accordingly, lacks jurisdiction of the second counterclaim.

■■ But even assuming that there were jurisdiction, the defendants have failed to prove either that the court proceedings or the notices to the defendants' customers were done in bad faith. "[I]t is not an actionable wrong for one in good faith to make plain to whomsoever he will that it is his purpose to insist upon what he believes to be his legal rights, even though he may misconceive what those rights are. * * * And this has long been recognized in respect to patent rights." Kaplan v. Helenhart Novelty Corp., 182 F.2d 311, 314 (2d Cir. 1950).

## CONCLUSIONS OF LAW

1. The court has jurisdiction of the complaint alleging patent infringement. 28 U.S.C. § 1338(a).

2. The defendants' fabrics are not constructed according to Figure 4 of the Aibel patent within the intendment of the parties as expressed in the agreement (Deft. Ex. H) and the plaintiff is barred from bringing this action by paragraph 3 of the agreement of October 26, 1959. The complaint must be dismissed.

3. There is no necessity to pass upon the question of infringement.

4. The court has jurisdiction of the first counterclaim alleging breach of contract.

5. By the bringing of this action the plaintiff has breached paragraph 3 of the October 26, 1959 agreement. Defendant Rugby Fabrics is entitled to its damages resulting from this breach and provision should be made for its inclusion in the

judgment to be submitted herein. A hearing before this court is set for April 6, 1964, at 2:30 P.M. to ascertain the amount of the damages.

6. The court lacks jurisdiction of the second counterclaim alleging unfair competition.

7. Even assuming jurisdiction, defendants have failed to prove by a fair preponderance of the credible evidence that the plaintiff has unfairly competed with the defendants. This counterclaim is, accordingly, dismissed.

8. No independent award of attorneys' fees is made, 35 U.S.C. § 285.

9. Plaintiff's motion to strike the testimony concerning the Harris patent is denied. (362)

The settlement of a judgment and the awarding of costs will await the determination of defendant's damages on the counterclaim. Defendant Rugby Fabrics is directed to file and serve on or before March 27, 1964 a statement of (1) the items which it alleges compose its damages, (2) their amount, (3) the method of calculation, and (4) the legal basis for each claim of damages. The plaintiff, on or before April 3, 1964, shall file and serve its objections and any memorandum in support thereof.

APPENDIX A

## FIG. 4. OF THE PATENT IN SUIT
### F. L. AIBEL 2,667,775 FEB. 2, 1954

I 20, 00, 24, 44,
II 00, 02, 44, 42,

APPENDIX B

# SCHEMATIC DRAWING OF THE ACCUSED FABRIC ACCORDING TO DEFENDANT'S OWN DRAWING

FORMULA WITH ZERO DESIGNATION
AT LEFT (TRICOT METHOD):

I 02, 00, 24, 24
II 00, 20, 44, 22

FORMULA WITH ZERO DESIGNATION
AT RIGHT (RASCHEL METHOD):

I 20, 20, 42, 44
II 00, 22, 44, 24.

Supplemental Opinion

This memorandum is directed to the question of the damages sustained by the defendant Rugby Fabrics Corp. as a result of the plaintiff's breach of contract asserted as a counterclaim in this action.

'The defendant has limited its request for damages to its out-of-pocket litigation expenses in defending this action, consisting of counsel fees, disbursements, the expense of expert testimony, the salaries of Milton Kurz, its president, and Rugby Fabric's attendant clerical expenses in preparing for trial. (Tr. 682–83; Deft. Statement of Damages)

■ The pertinent facts are simply these: In settlement of a prior action involving the same patent as that sued upon in this action, the plaintiff Artvale and defendant Rugby Fabrics entered into an agreement, which in pertinent part provided:

> "(3) That the provisions of Paragraph (2) hereof shall not apply to other materials that do not have the specific structures set forth in Paragraph (2) hereof * * * and Artvale agrees not to bring suit against * * * Rugby * * * for infringement, or otherwise involve [it] in litigation under the patent in suit because of [its] making, selling or using such other materials."

In my prior opinion in the present action I found that the defendant's fabrics did not have the specific structures set forth in Paragraph (2) of the agreement and by bringing suit Artvale breached Paragraph (3) of the agreement.

It is important at the outset to delineate what is *not* involved in this application. This is not an application for an award of attorney's fees pursuant to 35 U.S.C. § 285. Such an award was refused in my prior findings. Nor does the issue concern the "historic equity jurisdiction of the federal courts" to award counsel fees in exceptional cases, Sprague v. Ticonic Nat'l Bank, 307 U.S. 161, 164, 59 S.Ct. 777, 779, 83 L.Ed. 1184 (1939) (Frankfurter, J.); see also Anno.: Right to Counsel Fees in Federal Courts, 8 L. Ed.2d 894 (1963); nor the equitable power of the New York courts to do so, see,

e. g., Murray v. Kelly, 14 App.Div.2d 528, 217 N.Y.S.2d 146 (1961), aff'd 11 N.Y.2d 810, 227 N.Y.S.2d 435, 182 N.E.2d 109 (1962). The counterclaim asserted an action at law for breach of contract and the sole issue is whether the expenses of litigation, including counsel fees, caused by the breach of a contract not to sue entered into in settlement of a prior litigation, are properly items of damages.

■■ While not touched upon by the parties, it seems clear that New York law governs the rights of the parties under this contract made by New York corporations in New York even though the jurisdiction of the complaint is premised on a species of federal question jurisdiction, 28 U.S.C. § 1338. "[I]t is the *source* of the right sued upon, and not the ground on which federal jurisdiction over the case is founded, which determines the governing law. * * * Thus, the Erie doctrine applies, whatever the ground for federal jurisdiction, to any issue or claim which has its source in state law." Maternally Yours, Inc. v. Your Maternity Shop, Inc., 234 F.2d 538, 540–541, n. 1 (2d Cir. 1956). See 28 U.S.C. § 1652 and Note, The Competence of Federal Courts to Formulate Rules of Decision, 77 Harv.L.Rev. 1084, 1087–88 (1964). The Erie trilogy[1] compels the application of New York law. Neither the fact that the contract on which the counterclaim is based was executed in settlement of a prior federal court litigation, compare Kern v. Hettinger, 303 F. 2d 333 (2d Cir. 1962), nor that the contract relates to a federally granted patent, see Luckett v. Delpark, Inc., 270 U. S. 496, 46 S.Ct. 397, 70 L.Ed. 703 (1926), implies "a strong federal policy" within the meaning of the Byrd case, see fn. 1 supra, sufficient to warrant the application of federal law.

■ In New York, as in virtually all jurisdictions, the expenses incurred by a litigant, including counsel fees, in seek-

---

1. Erie R. R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); Guaranty Trust Co. v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945); Byrd v. Blue Ridge Rural Elec. Coop., Inc., 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958).

ing legal redress against his adversary are not recoverable as general or special damages, either in the action in which the expenses are incurred or in a subsequent action in the absence of contractual or statutory authorization. Kessler v. Austin, 234 N.Y.S.2d 857 (Sup.Ct.1962); Gorman v. Kings Mercantile Co., 36 Misc. 2d 38, 231 N.Y.S.2d 642 (Sup.Ct.1962); 1 Clark, New York Law of Damages § 145. The time, money and expense of suing or being sued are viewed simply as "the consequences of evey suit." J. J. Theatres, Inc. v. V. R. O. K. Co., 96 N.Y. S.2d 271, 273 (Sup.Ct.1950). There is here no contractual or statutory provision for these expenses. However, where a breach of contract has caused a party to maintain or defend a suit against a *third person*, the courts have permitted the recovery against the contract breacher of counsel fees and other litigation expenses incurred in the prior suit involving the third party. Doyle v. Allstate Ins. Co., 1 N.Y.2d 439, 154 N.Y.S.2d 10, 136 N.E.2d 484 (1956); 5 Corbin, Contracts § 1037 at 190–91 (1964); 1 Sedwick, Damages § 240 at 480 (9th Ed. 1913); Restatements, Contracts § 334 (1932); 15 Am.Jur. Damages § 144; 25 C.J.S. Damages § 50. A similar exception has been created to entitle a person, who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a *third person*, to recover the reasonable value of attorney's fees and other expenses incurred in the earlier litigation. See, e. g., Shindler v. Lamb, 25 Misc.2d 810, 211 N.Y.S.2d 762 (Sup. Ct.1959), aff'd 10 A.D.2d 826, 200 N.Y.S. 2d 346 (1960), aff'd 9 N.Y.2d 621, 210 N.Y.S.2d 226 (1961); Restatement, Torts § 914 (1939); Anno.: Right to recover as damages attorneys' fees incurred in earlier litigation with third person through tortious act of present adversary, 45 A.L.R.2d 1183 (1956); 25 C.J.S. Damages § 50; 15 Am.Jur. Damages § 144.

These exceptions have been limited, however, to the expenses of litigation with third parties and have not been extended to the expenses between the parties themselves, Doyle v. Allstate Ins. Co., supra; 5 Corbin, supra at 225–26, even when the result of suing or being sued is caused by the wrongful act of the opposing party. Gorman v. Kings Mercantile Co., supra; Rosenzweig Trading Co. v. Feinstein, 103 N.Y.S.2d 515 (Sup.Ct.1951). The *Doyle* case is particularly apposite. There the defendant-insurer issued a policy to the plaintiff insured in which it covenanted to "defend any suit against the insured alleging such injury, sickness, disease or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent." When the plaintiff was sued, the defendant refused to defend, necessitating the plaintiff to retain counsel. In a subsequent action to recover his legal expenses in both the prior action involving the third party and his present action against the defendant, the court permitted recovery only of the expenses with the third party, stating:

"Plaintiff cites no authorities in support of his contention that he is entitled to recover the legal fees and expenses incurred in the present suit and we have found no such authorities." 1 N.Y.2d at 444, 154 N.Y.S.2d at 14, 136 N.E.2d at 487.

The parties have not cited, nor has the court been able to find, any New York precedent dealing with the damages flowing from the breach of a covenant not to sue. The New York courts have consistently held that litigation expenses between adversaries in excess of taxable costs are not to be allowed in the absence of contractual or statutory provisions allowing such expenses. See, e. g., Dunkel v. McDonald, 272 App.Div. 267, 70 N.Y.S.2d 653 (1947), aff'd 298 N.Y. 586, 81 N.E.2d 323 (1948). In fact, the New York courts have been reluctant to allow such expenses even when urged to do so by contractual or statutory provisions. Thus, the words in a performance bond that the obligor "shall fully indemnify and save harmless the Obligee from all cost and damages they may suffer by reason of failure so to do and shall fully

reimburse and repay to Obligee all outlay and expense which the Obligee may incur in making good any such default" have been held not to include legal expenses. Robbins v. Melbrook Realty Co., 28 Misc.2d 1076, 213 N.Y.S.2d 403 (Sup. Ct.1961). See also Swiss Credit Bank v. International Bank, Ltd., 23 Misc.2d 572, 200 N.Y.S.2d 828 (Sup.Ct.1960). Similarly, in Manko v. City of Buffalo, 271 App.Div. 286, 65 N.Y.S.2d 128 (1946), aff'd 296 N.Y. 905, 72 N.E.2d 623 (1947), when urged to construe the word "damages" in former Section 21 of the Civil Service Law permitting a veteran to bring an action to obtain a preference, the court responded:

> "* * * the question here presented involves the age old controversy whether costs fully compensate a litigant. Concededly they do not. Yet it has been the public policy of this state, from time immemorial, to regard them as adequate. It has never been the rule, except in limited classes of litigation, to allow, as damages, prior legal expense. If the cause of action authorized by this statute is to become another exception to the usual rule of damages, that should be done, not by the courts, but by the legislature, the proper branch of government to change the public policy." 271 App. Div. at 302, 65 N.Y.S.2d at 143.

The New York courts have also been reluctant to create any further exceptions to the general rule. See, e. g., Idyll v. Kohn, 199 N.Y.S.2d 165, 169 (Sup.Ct. 1960):

> "The instant action is not within the exceptions and this court is of the opinion that the extension of the right to recover counsel fees would be in contravention of precedent established upon well reasoned rationale."

 Unquestionably much logic may be marshalled for the position that, where one, in settlement of prior litigation, has agreed not to sue or embroil the other in litigation and then does so, the out-of-pocket disbursements incurred by the other party, including counsel fees, should properly be items of damage. The law should not fail to recognize the salutary benefits of parties settling their differences without judicial intervention and agreeing among themselves not to further embroil themselves in litigation. To permit a party to repudiate this promise and then to hold that the reasonable counsel fees and other litigation expenses incurred are not proper items of damages would seem to be the antinomy of this policy. But perhaps an equal amount of logic can be marshalled to argue that one who has agreed to defend an action and fails to do so should respond to its covenantee not only with the expenses incurred in defense of the action brought by a third party, but also with the litigation expenses of the suit brought against the covenantor. But such is not the law of New York as the Doyle case makes clear. It "is not uncommon for federal courts to fashion federal law where federal rights are concerned," Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 918, 1 L.Ed.2d 972, 457 (1957), and oftentimes "it is the duty of the courts to be alert to provide such remedies as are necessary to make effective the congressional purpose." J. I. Case Co. v. Borak, 32 U.S.L.Week 4480, 4482 (U.S. June 8, 1964). However, where state law governs the rights of the parties, the duty of the federal court is simply to ascertain as best it can what the state courts would declare the law to be.

 Sitting as a federal judge and finding "no confusion in the [New York] decisions, no developing line of authorities that casts a shadow over the established ones, no dicta, doubts or ambiguities in the opinions of [New York] judges on the question, no legislative development that promises to undermine the judicial rule," Bernhardt v. Polygraphic Co. of America, 350 U.S. 198, 205, 76 S.Ct. 273, 277, 100 L.Ed. 199 (1956), I am bound to deny, as I think the New York courts would, the defendant's out-of-pocket litigation expenses incurred in the defense of this suit.

The defendant is therefore entitled to no damages by reason of the plaintiff's breach of contract. The foregoing constitutes my Findings of Fact and Conclusions of Law, pursuant to Fed.R.Civ.P. 52(a).

Settle judgment and decree on notice in accordance with both the Findings of March 20, 1964 and this memorandum. Costs are taxed in favor of the defendant.