**WASHINGTON ALUMINUM COMPANY, Inc. and Hartford Accident & Indemnity Company, Appellants,**

v.

**PITTMAN CONSTRUCTION COMPANY, Inc., Appellee.**

No. 23864.

United States Court of Appeals
Fifth Circuit.

Sept. 18, 1967.

Benjamin R. Slater, Jr., W. Malcolm Stevenson, Malcolm L. Monroe, New Orleans, La., for defendants-appellants, Washington Aluminum Company, Inc. and Hartford Accident & Indemnity Company, Venable, Baetjer & Howard, William J. McCarthy, Baltimore, Md., Monroe & Lemann, New Orleans, La., of counsel.

Arthur C. Reuter, New Orleans, La., Reuter, Reuter & Schott, New Orleans, La., for Pittman Construction Company, Inc., appellee.

Before GEWIN and AINSWORTH, Circuit Judges, and LYNNE, District Judge.

GEWIN, Circuit Judge.

In this diversity action before the United States District Court for the Eastern District of Louisiana, Pittman Construction Company, Inc. (Pittman) sought to recover from Washington Aluminum Co., Inc. (Washington) and its surety, Hartford Accident and Indemnity Co., damages for default of contract and attorney's fees. The district court found for Pittman and awarded damages in the amount of $10,470.00 together with attorney's fees of $2,617.00 plus costs, and Washington appeals. We affirm that portion of the district court's judgment awarding damages for Washington's failure to perform its contract, but we must reverse the court's award of attorney's fees.

On August 13, 1962, the National Aeronautics and Space Administration (NASA) issued an invitation for bids for work to be performed at the NASA Computer Facility at Slidell, Louisiana. The overall project included the construction of a free access elevated floor. Pittman, a general contractor, received an invitation along with the pertinent documents, specifications and drawings, including particular information about the elevated floor. Specification No. FE–D–306 entitled "Specifications for Computer Facility at Slidell, Louisiana," stated that the elevated floor shall consist of tile covered panels and that all metal used in the floor panels shall be aluminum. Contrary to the above requirement that the floor be constructed of aluminum, Drawing No. MIC–CF–378, Sheet A–2, referred to in the specifications, reflected a steel floor. However, this conflict was resolved by provision 2 of the General Provisions which stated "in case of difference between drawings and specifications, the specifications shall govern."

Pittman submitted a bid for the construction work. The bids were opened on August 27, 1962, and a contractor other than Pittman was the low bidder. However, the low bidder qualified his bid to the extent that a floor other than one made of aluminum would be supplied. NASA rejected the qualified bid and notified Pittman that its bid was accepted. Accordingly, on August 31, 1962, Pittman executed a written contract with the Government for the construction work, whereby Pittman agreed to perform the work in strict accordance with the General Provisions, Specification No. FE–D–306 and other designated provisions, schedules and conditions.

On September 12, 1962, Pittman entered into a written contract with Washington for the construction of the elevated free access floor system. Washington had in recent years discontinued its manufacture of aluminum flooring and instead manufactured a steel panel floor, the WacoPlate series 500, Free Access Floor System. Initially this subcontract provided that Washington was to construct the floor in accordance with Pittman's contract with NASA. Pittman's contract, while containing the discrepancy between the specifications, calling for an aluminum floor, and the drawing, reflecting a steel floor, also embodied General Provisions declaring that the specifications would govern and therefore, resolved the discrepancy as to what metal was to be used in the construction. Hence under the Pittman contract, the floor had to be constructed of aluminum. However, the subcontract between Pittman and Washington further contained language, purporting to describe Pittman's obligation under its contract with NASA and Washington's obligation to Pittman under the subcontract, namely:

> "To furnish all labor, tools, equipment, materials, etc., to completely furnish and install the Elevated Free Access Floor System complete in every respect in full accordance with job plans and specifications, *and as detailed on drawing number MIC–CF–378.*" (Emphasis added)

In view of the fact that Pittman was bound to furnish an aluminum floor in accordance with the specifications, the above description of the obligations of the parties is obviously in conflict with the prime contract to the extent indicated. Also typed in the subcontract form is the additional provision: "Work to be car-

ried on to meet the job requirements as set forth by contractor and specifications."

Washington then submitted drawings of its WacoPlate floor for approval by NASA. NASA rejected the shop drawings because they were not in accord with the specifications which call for an all-aluminum floor. Both Pittman and Washington appealed to NASA to reconsider but to no avail. Washington claimed it could not and actually it never did furnish an aluminum floor. Pittman then contracted with Liskey Aluminum, Inc. for an aluminum floor and brought this action against Washington for the $10,470.00 difference between the price Pittman had to pay Liskey and the contract price between Pittman and Washington, plus attorney's fees.

At trial Washington insisted that its contract with Pittman was to furnish a WacoPlate Steel floor and that if such floor was unacceptable by NASA the contract was automatically terminated. On the other hand, Pittman insisted that its subcontract with Washington was not restricted to a steel floor but bound Washington to install the type of floor required by and in accordance with the specifications or any floor that NASA would approve. The district court found that the contract between Pittman and Washington obligated Washington to furnish the same floor as Pittman was bound to furnish, namely an aluminum floor, and therefore the subcontract was not conditioned on NASA's acceptance of a WacoPlate floor. Since Washington failed to furnish an aluminum floor, the only type of floor acceptable to NASA, the court found Washington in default. Additionally, the court held that the subcontract provided for the payment of attorney's fees.

At issue is the correct construction of the subcontract between Pittman and Washington. At trial parol evidence concerning the transactions and negotiations between the parties prior to executing the subcontract in question was admitted by the court. We find that the district court was correct in allowing such evidence to be presented.

■ Louisiana law as to whether parol evidence relative to a written instrument is admissible, Louisiana Civil Code, Art. 2276, states:

"Neither shall parol evidence be admitted against or beyond what is contained in the acts, nor on what may have been said before, or at the time of making them, or since."

This article establishes a general rule banning the use of parol evidence to explain, contradict, vary, add to, or subtract from the terms of a written contract. Hatch v. Morgan, 12 So.2d 476 (La.App.1942); Sibley v. Lester, 8 So.2d 320 (La.App.1942); J. A. Fay & Egan Co. v. Roseland Box Co., Inc., 170 La. 602, 128 So. 649 (1930).

■ However, this general rule is subject to several exceptions. One such exception is that where it is alleged that through fraud, error or mistake the written instrument does not express the purpose of the parties, the writing will be interpreted in accord with the intent of the parties. Therefore, where error, fraud or mistake has been specifically averred, oral testimony is admissible to vary the terms of a written contract. Housecraft Div. of So. Siding Co. v. Jones, et al., 120 So.2d 662 (La.App. 1960); McGee, et al. v. Finley, et al., 65 So.2d 384 (La.App.1953); Britton v. Myles, 9 So.2d 50 (La.App.1942); McQueen v. Palmer, 155 So. 264 (La.App. 1934). Another major exception to the general rule is that where the terms of a contract are susceptible of more than one interpretation, or there is uncertainty or ambiguity as to its provisions or where the intent of the parties cannot be ascertained from the language employed, parol evidence is admissible to clarify the ambiguities and to show the intentions of the parties. Capizzo v. Traders & General Ins. Co., 191 So.2d 183 (La.App.1966); Snow-White Roofs, Inc. v. Boucher, et al., 182 So.2d 846 (La. App.1966); Marcann Outdoor, Inc. v. Hargrove, et al., 140 So.2d 815 (La.App. 1962); Collins, et al. v. Brunet, et al.,

239 La. 402, 118 So.2d 454 (1960); Cardos, et al. v. Christadoro, et al., 228 La. 975, 84 So.2d 606 (1955). In light of the language in the subcontract referred to earlier, describing Pittman's contractual obligation to NASA, Washington's obligation to Pittman, and the fact that Washington in its answer alleged that its consent to the subcontract was obtained by an error of fact and induced by misrepresentations on the part of Pittman, we find that under either of these exceptions, parol evidence was admissible.

The events leading up to the signing of the subcontract may be briefly described as follows: Prior to the opening of the bids a representative of Washington talked to NASA officials about the discrepancy between the drawings and the specifications for the elevated floor. Apparently NASA informed him that the plans and specifications were not meant to be restrictive and that Washington should feel free to bid. The record also discloses that Washington had a contract with the architectural engineering firm, the Vector Corporation, which designed the plans for the project in question.

At the time Pittman went to sign its contract with NASA it was pointed out to him by NASA officials that the specifications called for an all-aluminum floor. Also the terms of Pittman's contract with NASA clearly required him to furnish an aluminum floor. At a pre-construction conference held some days later, Liskey Aluminum, Inc. was present as a possible subcontractor for the elevated floor and Liskey presented its shop drawings for a plywood floor which were approved by NASA.[1] This approval was rescinded the next day and Pittman was notified by telephone, confirmed later by telegram, that the contract required aluminum and that substitute flooring was not acceptable. Therefore while Pittman's testimony at times suggests that he did not know that aluminum was the only acceptable metal and that NASA had never informed him of such fact, this testimony is clearly contradicted by his own contract and the telegram from NASA which were unequivocal on this point. There is also a substantial conflict in the evidence as to the extent of the knowledge of Washington as to whether aluminum was the only acceptable material. The record shows clearly that Washington had discussed the subject with NASA officials and further that it was well aware of the conflict between the drawings and specifications.

The evidence concerning what actually transpired at the signing of the subcontract between Washington and Pittman is highly contradictory. Pittman testified that Washington was well aware of the discrepancy between the specifications and drawings and that Washington agreed to construct the floor in accordance with NASA's requirements and consequently it was bound by the contract to build the floor as NASA directed. Pittman testified that he had no idea that Washington could not construct an aluminum floor. However, Pittman admitted that he knew Washington desired to furnish its steel floor, and Pittman insisted that Washington told him that this floor met the requirements and that NASA would surely approve it. Therefore according to Pittman he did not care if Washington wanted to construct the floor from steel, aluminum or any other material, because Washington obligated itself under the subcontract to build the floor in accordance with the appropriate data supplied by NASA.

Washington testified that their negotiations with Pittman were solely for the

---

1. A great deal of time was spent at trial trying to determine if Washington could have submitted its steel floor for approval by NASA without first entering into a subcontract with Pittman. Washington testified that Pittman stated to them that it was absolutely necessary to have a signed contract before NASA would consider their floor. Of course Pittman denies this and points to the fact that Liskey submitted its floor without a contract. However, the testimony of NASA officials indicates that after the general contractor has been selected, NASA does not deal with anyone except through the general contractor, Pittman in the instant case.

construction of a steel floor. Since they were aware of the discrepancy and knew that NASA could interpret its plans and specifications as requiring an aluminum floor, they were only willing to contract with Pittman for a floor in accordance with the drawing which showed steel. Washington insisted that it was understood by all at the signing of the subcontract that steel was the only type of floor which Washington was bound to furnish. Wenzel, an employee of Church Steel & Co., a sales firm which represented Washington, was also present at the subcontract signing. He testified that the parties clearly and with full understanding contracted for a steel floor. In fact when the conference began the subcontract had already been prepared by Pittman and its terms clearly obligated Washington to build an aluminum floor. Washington testified that it told Pittman that it was impossible for Washington to agree to construct aluminum flooring and that the contract would have to reflect steel. Washington asked for a letter from Pittman to this effect but Pittman instead added a clause to the contract, "and as detailed on drawing number MIC–CF–378," [2] for the purpose of clarifying the intent of the parties to agree only to steel. To the contrary Pittman testified that the clause referring to the drawing was added at Washington's suggestion solely because it showed actual details of construction of the floor, and the clause had no bearing whatsoever on restricting the subcontract to steel. Even though Pittman refused to give the letter requested by Washington, Washington nevertheless went ahead and signed the subcontract.

From this array of testimony the district court found that Washington clearly undertook to assume and fulfill Pittman's obligation for the elevated floor under the terms of Pittman's contract with NASA. Further, the court found that Washington was well aware of the disputed provisions and had actually conferred with NASA about the discrepancy. Finally, the court found that Washington knowingly "took a chance" on approval of its floor by NASA.[3]

2. This clause is the italicized clause in the paragraph of the subcontract quoted earlier in the body of the opinion.

3. The position of Washington was not entirely consistent during the trial. Mr. Gladden, Manager of Washington's panel products division, and the official who signed the contract and conducted negotiations and engaged in conversations with respect to it, testified that he was misled by Pittman's misrepresentations on which he relied. On the other hand, he stated that he had known one of the Pittmans for only one day before signing the contract and had never talked to the other one involved.

In response to a question from the Court as to the conflict as to the type floor to be furnished, he stated: "The subcontract is subject to the general contract."

At another point in his testimony, in response to a question by the Court, Mr. Gladden asserted:

"Of course, the contract, NASA's contract which incorporated the plans and specifications was ambigious. [sic] We met the plans. We didn't meet the specifications. We obviously can only bid on one if the two don't agree. So, our proposal was based on furnishing a floor system in connection with the plan."

However, after NASA had called on Pittman to perform its contract to install the aluminum floor and after Pittman had made a similar demand on Washington, more than three weeks after the subcontract had been signed and after NASA had rejected Washington's floor, Mr. Gladden wrote Pittman a lengthy letter from which we quote the following excerpts:

"Shortly prior to the opening of bids for this work, it was noted in this office that a discrepancy existed between the contract plans and specifications. In order to obtain a ruling on this difference, the writer phoned Mr. J. B. Roberts of NASA, Huntsville, who heard the problem explained and referred the writer to a Mr. Wolfschlager. When Mr. Wolfschlager was explained the problem, he stated that the specification was not meant to be restrictive although it might appear so and cited the drawing as evidence of this, and told us to feel free to bid.

"As a result of this call, and because our representative had worked with the Vector Corporation while the plans were

Even though the evidence presented by the parties was certainly conflicting and contradictory, we cannot say that the above findings of the court are clearly erroneous. Rule 52(a) F.R. Civ.P.; Continental Casualty Co. v. Stokes, 249 F.2d 152 (5 Cir. 1957); Manget Brothers, Inc., et al. v. The Bank of Greenwood, 381 F.2d 91 (5 Cir. 1967).[4] Nor are we able to reverse the findings of the trial court because the record leaves us with a conviction that a mistake has been made, as urged by the appellant. United States v. United States Gypsum Co., et al., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

We note that the court specifically found "as a fact" that the contract between Pittman and Washington was not ambiguous. Washington contends that such a finding is clearly erroneous. During the course of the trial the district court concluded that the contract was ambiguous on its face.[5] We agree with that conclusion and consider it to be a finding that the contract was ambiguous as a matter of law, thus authorizing the court to proceed to take parol or oral testimony with respect to the negotiations of the parties, the conversations between them at the time it was executed, and the background facts in order to determine the intent of the parties. It is noted that in the trial court as well as on appeal Washington claims error, mistake and misrepresentation in connection with the signing of the subcontract. Washington was permitted to introduce oral testimony freely and abundantly in support of its contentions over the objection of Pittman in order to explain and clarify the subcontract in question. A reading of the court's opinion clearly shows that the court considered all of the evidence presented in reaching its conclusion that Washington agreed to be bound to the same extent as Pittman. Consequently, we do not think that the finding of the trial court that the contract was not ambiguous "as a fact" is clearly erroneous. Such was the function the court was re-

---

being prepared, and we knew our product was acceptable to Vector, the job was quoted to all of the General Contractors bidding."

\*    \*    \*    \*    \*

"It is therefore our contention that the floor submitted for approval by the Pittman Construction Company on September 18, does, in fact, comply with the specification, in spite of the contradictions listed below:"

\*    \*    \*    \*    \*

"Drawing MIC-CF-378 was prepared by Vector Corporation and approved by Messers P. M. Logarde, A. J. Rogers and C. C. Hawkins of NASA.

"Surely these officials have made certain that the information contained on the drawing was correct and complete, and that the material shown and called for was suitable for its intended use."

\*    \*    \*    \*    \*

"We therefore claim that the contract drawing is valid because the special conditions make it part of the specification. We therefore expect to receive approval of our system for use on this project and further, we expect an extension of time for completion based on the time lapse between first submittal of drawings September 18, and the date of approval thereof."

4. In Continental Casualty Co. we stated: "Although the remaining proof is entirely documentary, it does not render the plaintiff's testimony immaterial to the decision of this case nor the trial judge's evaluation of his credibility unimportant. Here, in fact, the opportunity to observe the plaintiff as a witness is peculiarly important, for his credibility not only influences the weight to be given to his own testimony in open court, but also affects to an appreciable degree the trustworthiness and persuasiveness of much of the documentary proof as well."

5. At one point during the trial, the district judge commented that in his opinion the language in the contract between Pittman and Washington was ambiguous. We quote from the record:

"Mr. Reuter: I renew my objection to any parole [sic] or oral testimony in connection with the conversation leading up to the execution of the written contract.

"The Court: Don't you think this contract is ambiguous?

"Mr. Reuter: No, sir.

"The Court: I do. I think it is ambiguous and I think this testimony is admissible. Go ahead."

quired to perform after hearing all the evidence offered by the parties.

 It has long been the general rule in American courts, and the Supreme Court of Louisiana has repeatedly emphasized this rule, that attorney's fees may not be awarded as an element of damages except where specifically authorized by statute or by contract. Fleischmann Distilling Corp., et al. v. Maier Brewing Co., et al., 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967); Chauvin v. La Hitte, 229 La. 94, 85 So.2d 43 (1956); Breaux v. Simon, 235 La. 453, 104 So.2d 168 (1958). We have found no statutory or codal provision authorizing an award of attorney's fees in a case such as the one before us. Nor does the subcontract specifically authorize the recovery of attorney's fees.

The district court found that the subcontract, Article VII, provides for the recovery of attorney's fees. Article VII of the contract states in part:

> "The expenses incurred by the contractor as herein provided, either for furnishing materials or for finishing the work, and any damages incurred by such default shall be chargeable to and paid by said subcontractor * * * *"

Not only does this article fail to particularly authorize an award of attorney's fees, the article is completely silent as to such fees. In addition, no other provision of the contract provides for the recovery of attorney's fees in a suit for damages for default of contract.[6] Consequently, the district court's finding that attorney's fees were allowable under the contract is clearly erroneous. That portion of the judgment awarding attorney's fees is vacated and set aside. That portion awarding damages for breach of contract is affirmed. Costs of appeal are to be divided equally between the appellants and the appellee.

Affirmed in part, reversed in part.

6. The only reference in the contract to attorney's fees is found in Article XII. Such article provides that the subcontractor will "at his own cost and expense (including counsel fees) defend" any suit

brought to establish a lien or to enforce any claim for labor and materials. Clearly, this provision does not apply in a suit for breach of contract as here involved.