SUNDOWN, INCORPORATED,
Appellant,

v.

CANAL SQUARE ASSOCIATES,
Appellee.

SUNDOWN, INCORPORATED, et
al., Appellants,

v.

CANAL SQUARE ASSOCIATES et
al., Appellees.

CANAL SQUARE ASSOCIATES, a
partnership, Appellant,

v.

CERBERUS THEATERS, INC., Appellee.

Nos. 9324, 9325 and 9501.

District of Columbia Court of Appeals.

Argued April 28, 1976.

Decided June 12, 1978.

422

John Lodge Euler and John Lewis Smith, III, Washington, D. C., for appellants, Sundown, Incorporated, et al., in Nos. 9324 and 9325.

Rodney F. Page, Washington, D. C., for Canal Square Associates, et al., appellees in Nos. 9324 and 9325, appellant in No. 9501.

Carol W. Kinsbourne, Washington, D. C., with whom Donald H. Green, Washington, D. C., was on the brief, for Cerberus Theaters, Inc., appellee in No. 9501.

Before YEAGLEY and MACK, Associate Judges, and REILLY, Chief Judge, Retired.

YEAGLEY, Associate Judge:

These consolidated appeals involve three complaints, one cross-complaint, two counterclaims, and two setoffs concerning two leases on parts of Canal Square's building located at 3040 M Street, N.W.; one lease to Cerberus Theaters was for space for three theaters on the upper floor and the other to Sundown, Inc., was for a restaurant on the lower floor. There also is raised a question regarding the proper measure of damages to Cerberus for breach of those leases by Sundown and Canal Square.

We are called upon to determine whether Canal Square, the landlord, breached its lease with Cerberus, a theater, by failing to prevent interference with the latter's operations caused by amplified music coming from the other tenant, a restaurant operated by Sundown. We are required also to decide whether the loud music constituted a breach by Sundown of its lease with Canal Square. The trial court, sitting without a jury, answered both questions affirmatively. It awarded Cerberus a judgment of $60,000 against Canal Square, and awarded Canal Square a judgment of $36,564.80 against Sundown, as well as possession of the premises which Sundown had occupied. We conclude that the trial court was correct and accordingly affirm.

The facts of this case are relatively clear. Canal Square Associates, a limited partnership, hereafter Canal Square or landlord, has a long term lease on commercial property at 3040 M Street, N.W., in Georgetown. Charles Coyer and William Guy are general partners. The property was subleased to two tenants: Cerberus, Inc., since 1970, has operated three theaters on the upper floor; Sundown, Inc., beginning in 1971, operated a restaurant on the lower floor. James Haight, a party to the appeal in Nos. 9324

and 9325 is the general manager of Sundown. The focal points of this litigation are provisions in the leases Canal Square Negotiated with Cerberus and Sundown. We turn first to the Cerberus lease.

On May 22, 1969, Cerberus and Canal Square signed a 10-year lease for the upper floor which was drafted especially for this property. Canal Square was contemporaneously negotiating with a Sophia's restaurant to occupy the building's lower floor. There is no dispute that a major concern of Cerberus during its negotiations was the possibility that noise and odors from the future restaurant would interfere with its theater operations. Thus, various provisions were included in the Cerberus-Canal Square lease to accommodate these concerns. The relevant articles provide:

### NINTH: CONSTRUCTION OF DEMISED PREMISES

A. Landlord agrees to and shall perform such modifications, alterations, additions and constructions, at its sole cost, as are necessary and appropriate to convert the existing premises into three movie auditoriums, completed toilet rooms and plumbing fixtures, and a lobby area, completed except for painting, decoration and items of decor. Such work shall include all mechanical, electrical, plumbing and general contracting work, sloping of the floors, acoustical treatment as required in the partitions and elsewhere, construction of exits and entrances. It is understood and agreed that all of the work to be done by the Landlord shall be pursuant to the preliminary plans and outline specifications initialled by the parties and made a part of this Agreement. The final plans and specifications shall conform to such approved preliminary plans and outline specifications. It is further understood and agreed that such work will affect the first story of the existing structure as well as small portions of the basement and second story.

B. Tenant agrees to install, at its own cost, all theatre equipment, such as carpeting, theatre seats, projectors, screens,

sound system, signs, vacuuming system, turnstiles, ticket booth, showcases for food, beverages and other items for sale in the lobby area; painting, decoration and items of decor in the demised premises.

C. Landlord shall exercise its best efforts to complete all of the work as approved by the parties hereto no later than October 1, 1969.

## TWENTY–SECOND: LANDLORD'S DEFAULTS

Landlord agrees that in the event of Landlord's failure to pay any sum or sums which Landlord is obligated to pay, the non-payment of which may result in a charge or encumbrance upon the demised premises, or in the event of Landlord's failure to perform any of Landlord's obligations hereunder, Tenant, in addition to any other rights it may have in law or in equity, shall have the right after thirty (30) days' prior written notice from Tenant to Landlord, to make payment of such sums or to perform such obligations, and thereupon Landlord agrees to reimburse Tenant for such sums, together with legal interest thereon until the same are repaid to Tenant, and Tenant shall have the right to receive an assignment of the claim of any payee against Landlord and shall have the future right to set-off against accruing rents or other sums payable to Landlord for such payment or expenditures made by Tenant, holding Landlord liable for any excess of such payments or expenditures over any amounts set-off against accruing rents and other sums, provided, however, the foregoing right of Tenant to setoff against accruing rents or other sums payable to Landlord shall be enforceable only against Landlord and its successors and assigns, but shall not apply to the holder of any mortgage or deed of trust on Landlord's interest or any of its successors or assigns which may acquire the Landlord's interest by virtue of a foreclosure of a mortgage or deed of trust.

## TWENTY–SIXTH: LANDLORD'S OTHER PROPERTIES

A. Landlord agrees that it will not lease to or for any theatre operation any premises which it owns or controls in the area having a radius of two city blocks from the demised premises, for the term of this Agreement or any extensions thereof.

B. Landlord agrees that adequate means of construction and insulation will be used in the building housing the demised premises to prevent noise or odors emanating from any other persons in the building from interfering with Tenant's use of the demised premises, including particularly but not limited to kitchen noises and odors from the restaurant planned for the basement under the demised premises, and live or amplified music. Landlord agrees that such construction and insulation are essential for the Tenant's use of the demised premises.

Because Sophia's restaurant was unable to secure a liquor license, it never became the lower floor tenant.[1] In its place, Sundown became the restaurant tenant when it signed a 10-year lease with Canal Square on March 9, 1971, contingent on a liquor license being obtained. The license was granted on July 2, 1971, to Sundown, operating as the Chesapeake Inn-Georgetown, a "family style restaurant without live entertainment." Portions of the Sundown-Canal Square lease relevant to this litigation follow:

1. Canal Square and Sophia's signed a lease agreement on March 26, 1971; under Article 35 of the lease, the obligations of the parties were contingent on Sophia's obtaining a liquor license. Article 7 of the lease described the use of the leased premises as "a restaurant and food service business and any other related legitimate business." Subsection (c) of Article 7 included the landlord's (Canal Square's) representation that "no laws, covenants or restrictions . . . prohibit or limit [the operation of] a restaurant business with liquor service and entertainment . . .." The subsection further provided that licenses and permits could be obtained to authorize the "sale and dispensing of alcoholic beverages and entertainment."

6. Use of Leased Premises

(a) Purpose.

Tenant shall not use, or suffer the Leased Premises to be used, for any disorderly or unlawful purpose. The Leased Premises are to be used by Tenant for the purpose of operating a restaurant and food service business and any other related legitimate business. Tenant shall have the right to offer for sale, and to sell to the general public such food and beverages (including alcoholic beverages) as are usually sold in fine restaurants in the metropolitan area of Washington, D.C., and in addition thereto, but not by way of limitation, cigars, cigarettes, and other tobacco products. Tenant agrees to keep the Leased Premises open for the regular conduct of its business aforesaid, for the lunch meal and the dinner meal at least six (6) days (except legal holidays or declared vacation periods) per week during the continuance of this Lease and for such other additional period of operation as may, in Tenant's judgment, be determined by the requirements to Tenant's patronage therein, except when prevented by strikes, fire, or other casualty or other causes beyond Tenant's control. Tenant shall not conduct any carryout business on the Leased Premises, but the foregoing shall not prevent Tenant from providing catering services to facilities outside of the Leased Premises.

(b) Covenant to Comply with Laws and Ordinances.

In conducting the business herein authorized, Tenant covenants to comply with all applicable laws, regulations, and licensing requirements.

(c) Zoning, etc.

Landlord represents that there are presently, and that there will be at the date upon which the Leased Premises are opened for the conduct of business, no laws, covenants or restrictions which would prohibit or limit Tenant from operating on the Leased Premises a restaurant business with liquor service and entertainment. Landlord agrees upon request by Tenant to sign promptly and without a charge therefor to Tenant, but

at Tenant's sole expense, any application for licenses and permits as may be required by Tenant for the conduct and operation of the business herein authorized or for the proper use of the Leased Premises, including, without limitation, applications for licenses, signs, and any other licenses where the signature of the Landlord or owner is required by applicable laws in force at the time, the cost of any such licenses and permits to be borne by Tenant.

7. Condition of Leased Premises.

(a) Tenant has inspected the Leased Premises and accepts the same "as is" and acknowledges that Landlord has completed all of its work in the Leased Premises, except for the installation of certain kitchen equipment which Landlord covenants to install in the Leased Premises prior to the Rent Commencement Date in accordance with the original plans initialled by Landlord and Tenant. The cost of any changes in the location of such equipment desired by Tenant shall be paid by Tenant.

(b) Warranty of Leased Premises.

Landlord warrants the Leased Premises to be free from faulty workmanship or defective materials and to be in good and servicable condition. Landlord shall, at Landlord's expense, remedy any defect in the Leased Premises which appears prior to the expiration of one year after the Rent Commencement Date. Landlord also warrants that the premises have been constructed to meet all standards of the agencies of the government of the District of Columbia including the Health Department.

. . . . .

15. Building Rules and Regulations.

Tenant agrees to abide by and comply with any and all reasonable regulations issued by Landlord for the care, comfort, and safety of the Building tenants and their invitees, provided that such regulations are not inconsistent with any of the provisions of this Lease.

. . . .

36. Entire Agreement.

This instrument contains all the agreements and conditions made between the parties hereto and may not be modified orally or in any other manner than by an agreement in writing, signed by all the parties hereto or their respective successors in interest.

Although Cerberus experienced minor disturbances from sound emanating from the restaurant from the time construction of the restaurant started,[2] the events which culminated in this litigation began on the evening of May 25, 1973. A newly hired live rock band playing at Sundown's restaurant shortly after an appropriate amendment to Sundown's liquor license had been obtained generated enough noise to interfere with the showing of a movie at one of the upstairs Cerberus theaters. The next day, Cerberus requested both Canal Square and Sundown to stop the live band performances. That evening, May 26, the band performance was repeated and again interfered with a movie being shown at the Cerberus theater.[3] A second request from Cerberus that the performances stop was forwarded to and received by Sundown and Canal Square on May 29. That same day, Canal Square wrote a letter to Sundown advising it as follows:

Regarding live entertainment recently engaged to play music at the Chesapeake Inn, I hereby advise you this music will cease immediately.

According to the terms of paragraph 15 of your lease, the Chesapeake Inn as tenant agrees to abide by all reasonable regulations issued by the landlord for the care, comfort and safety of the building and tenants therein.

2. Letters or conversations between Cerberus and Canal Square regarding existing and future noise problems were dated January 14, 1970, April 3, 1970, July 8, 1970, January 27, 1971, January 7, 1972, April 12, 1972 and August 28, 1972.

3. Cerberus refunded the admission price ($2.60) to 29 complaining patrons.

4. Live entertainment (a singer with an electric guitar) was performed in the Inn on September 21 and 22, 1973. Cerberus' motion to hold Sundown and Haight in contempt was denied,

On May 31, 1973, Cerberus filed a complaint for injunctive relief, damages and costs against (1) Canal Square Associates (and partners Charles Coyer and William Guy) and (2) Sundown, Inc., (and James Haight). (Appeal No. 9325) Sundown and Haight crossclaimed against Canal Square for indemnity if Cerberus prevailed; Canal Square, and Coyer and Guy counterclaimed against Sundown and Haight for any amount awarded to Cerberus should Cerberus prevail in the litigation.

A temporary restraining order against Sundown and Haight was entered on May 31, and a preliminary injunction was entered on June 14, running against Sundown, Haight, Canal Square, Coyer and Guy. The preliminary injunction prohibited allowing or performing "live entertainment or amplified music" in the Chesapeake Inn, Georgetown, during the hours that Cerberus was showing its movies.[4]

A hearing on the merits of the injunction and crossclaim was held on March 26, 1974. An interim consent decree entered into between Cerberus and Sundown and Haight was filed on May 3, 1974;[5] the decree established maximum sound levels (in decibels) and included liquidated damages provisions.[6]

On May 14, 1974, Canal Square filed two actions in Superior Court, Landlord and Tenant Branch. In the first (our appeal No. 9501), Canal Square sued Cerberus for possession of the premises and back rent. Cerberus' defense was that it was setting off against rent due its cost of performing Canal Square's obligations under the lease,

but Sundown and Haight were ordered to pay Cerberus $300 as reasonable attorneys' fees. [Order of September 28, 1973, record at 283.] No appeal was taken regarding this issue.

5. The decree, dated April 3, was modified on April 19, and the modified version filed May 3.

6. On February 26, 1975, sanctions under the liquidated damages provisions for violating the consent decree were entered by Judge Newman. Sundown and Haight were ordered to pay Cerberus $1,500 for two violations.

namely preventing noise interference by Sundown. In the second action (our appeal No. 9324), Canal Square sued Sundown and Haight for possession of the premises, back rent, and unpaid utilities. Sundown counterclaimed for damages for the cost of structural changes. These two actions, by consent of the parties, were consolidated with the injunction case.

The trial court disposed of all the issues in the three cases in a series of orders and judgments. On January 17, 1975, a permanent injunction against Canal Square, Sundown, and Haight was issued by the court. The court found (1) that Canal Square failed to issue timely and proper regulations to order Sundown and Haight to refrain from interfering with the Cerberus theater operations, and (2) that Sundown and Haight did in fact interfere with the theater operations by playing loud and amplified music. The court ordered that Sundown and Haight cease interfering with Cerberus' business and enjoined the interfering "sound" ["including amplified music and entertainment"]. Decibel levels were set for the permitted music which was to be "[o]nly recorded music[;] no live music or other forms of entertainment [were to] be allowed in the Sundown Defendants' premises." Further, Canal Square was ordered to issue a regulation directing the Sundown defendants to act in accordance with the non-interference and decibel level provisions of the injunction.

On February 24 and 25, 1975, the final findings of fact, conclusions of law, and judgments were entered by the court in the three cases. Summarized, these findings and conclusions chronicled the parties' difficulties as follows:

When Canal Square negotiated the Sophia's restaurant lease, it was Canal Square's "understanding" that the "entertainment" permitted in the lease would be "background music," that is, "strolling violinists." Thus, when Canal Square negotiated the lease with Sundown and Haight for the same restaurant premises, the "understanding and agreement" reached was that only "background music" would be permissible under the lease. The court found that when Coyer of Canal Square assisted Sundown in its application for a liquor license, Sundown represented to the Alcoholic Beverage Control Board that it would conduct a family style restaurant without live entertainment. The court concluded after hearing testimony that "the only reasonable construction of the lease provisions in light of the facts is that entertainment would be limited to background music."

With respect to the Canal Square-Cerberus lease, adequate construction of the premises to insure no noise interference was considered essential to the Cerberus theater operations and was specifically provided for in the Canal Square-Cerberus lease. The court found that the landlord failed to incorporate in the restaurant lease the restrictions called for in the theater lease against sound and also failed to issue to Sundown regulations regarding sound that it could have issued under the lease.

Problems did arise about the noise and Cerberus gave notice to Canal Square on a number of occasions beginning as early as January 14, 1970 that the acoustical work was "inadequate to prevent sound interference from the area where the restaurant would be located," see note 2 supra. Prior to the restaurant's opening, Cerberus sought permission to enter the restaurant and install the necessary acoustical barriers but "[n]either [Sundown] nor [Canal Square] would give the required permission." Canal Square did not take any corrective action after being informed of the problem by Cerberus but stated that "if sound intrusion became a problem when the restaurant opened [it] would correct the situation." After the restaurant opened, Cerberus repeatedly informed the landlord that noise was emanating from the restaurant and disturbing its patrons but nothing was done to improve the sound insulation.

Sundown, without any notice to its landlord Canal Square, obtained ABC Board permission on February 23, 1973, to remove the liquor license restriction on live entertainment, and subsequently "played music

of such volume and intensity" (a "live and amplified band") that it interfered with the Cerberus theater operations. Cerberus immediately requested Sundown and Canal Square to stop the interference,[7] and, after the second request, Canal Square wrote to Sundown ordering them "to cease and desist from such activity."

From these findings of the factual setting, the trial judge concluded that Sundown breached its lease with Canal Square by permitting the rock band performances and other "non-permitted" entertainment, and further that Sundown was not entitled to recover on its counterclaim against Canal Square because Canal Square did not breach its lease with Sundown. Consequently, Canal Square was adjudged to be entitled to possession of the premises occupied by Sundown, Inc. in addition to $36,564.80 damages plus costs from Sundown, Inc.[8]

With respect to the Canal Square-Cerberus portion of this litigation, the trial court concluded that Canal Square breached its lease with Cerberus by (a) failing to construct the premises so as to prevent sound interference, (b) failing to issue sound regulations to Sundown, and (c) failing to seek or support judicial enforcement of Article 26B of the lease against Sundown [no noise interference provision]. The trial court found that in light of Canal Square's defaulting on its lease obligation regarding noise interference, and its failure to take judicial action, Cerberus was authorized by Article 22 of the lease[9] to perform Canal Square's obligations and to be reimbursed or to set off those expenses against accruing rent.

The expenses incurred totalled $60,000 and consisted of attorneys' fees, acoustical experts' fees, employees' time, court costs, and miscellaneous expenses.[10]

As a final matter, the trial judge concluded that Canal Square was entitled to "indemnity" from defendants Sundown and Haight of "any and all losses it has suffered from Cerberus Theaters, Inc. in this action," and judgment was entered in Canal Square's favor against Sundown and Haight for $60,000 plus costs.

■ On appeal we are confronted with two main issues and a question of damages. First, we must decide whether we agree that Canal Square breached its lease with Cerberus by failing to prevent the interference caused by Sundown's noise. Second, we must decide whether the loud and amplified music played by Sundown was a breach of the Canal Square-Sundown lease. Since the case was tried without a jury, the trial court's judgment "both as to the facts and the law . . . may not be set aside except for errors of law unless it appears that the judgment is plainly wrong or without evidence to support it." D.C.Code 1973, § 17–305.

### I.

The first issue, breach of the Canal Square-Cerberus lease, involves Article 26B of the lease:

> B. Landlord [Canal Square] agrees that adequate means of construction and insulation will be used in the building housing the demised premises to prevent noise or odors emanating from any other persons in the building from interfering with Tenant's [Cerberus] use of the demised premises, including particularly but

---

7. The requests were dated May 25 and May 26, 1973. Cerberus again requested Sundown to stop the interference in September 1973. *See* note 4, *supra.*

8. The trial court specifically found that Sundown failed to pay five monthly rentals to Canal Square totaling $25,000; that it also failed to pay various utility bills totaling $11,564.80; and that there was no justification for Sundown's failing to pay these sums to Canal Square.

9. The trial judge found that Article 22 was properly invoked by Cerberus.

10. Of the $60,000, $42,535.50 has been set off by Cerberus against accruing rent; the balance of $17,464.50, plus costs and 6% interest, was ordered to be paid by Canal Square to Cerberus.

not limited to kitchen noises and odors from the restaurant planned for the basement under the demised premises, and live or amplified music. Landlord agrees that such construction and insulation are essential for the tenant's use of the demised premises.

Canal Square, as landlord, could perform its obligations under this provision by either (a) adequately constructing and insulating the building so as to prevent noise interference and/or (b) controlling the noise or the source of the noise itself (thus making the existing construction and insulation adequate).[11] There is no contention here that the construction/insulation was adequate in terms of the landlord's Article 26B obligation, thus what we must decide is whether the landlord's actions under alternative (b) were adequate.

■ Canal Square claims it satisfied its Article 26B obligations by "reach[ing] an understanding with [the restaurant] Sundown that only 'background music' would be allowed, an agreement [it asserts] fulfilled its obligation to Cerberus." The trial court, however, found that something more was required to fulfill the Article 26B obligations. We hold that the trial court's findings were supported by the evidence and justified its holding that Canal Square's efforts fell short of complying with its legal obligations under the lease.

Canal Square's defense that it entered into an "understanding" with Sundown requires further comment. That "understanding" involved their lease agreement and was the subject matter of a major portion of this three-party case. The lease provided that Sundown would use its premises as a "restaurant business with liquor service and entertainment." (Article 6(c).) Because the trial court found the lease to be ambiguous as to the meaning of "entertainment," it admitted parol evidence about the Canal Square-Sundown "understanding" as to a background music restriction. However, the "understanding" that the court found that Canal Square reached with Sundown concerning "entertainment" could not serve as an adequate substitute for the sound proof construction and insulation contemplated in Article 26B of the lease.

■ Moreover, the trial court specifically found that Canal Square's efforts to enforce its Article 26B obligations were inadequate in two other respects, both of which were tied to controlling Sundown's noise. First, the trial court found that Canal Square "failed to issue restrictions" on the sound generated by the restaurant, and second, that Canal Square "failed to seek or support judicial enforcement of the requirements of Article 26B." We cannot say that the trial court erred in concluding that in choosing to fulfill its Article 26B obligations in a way other than by construction or insulation, Canal Square failed to fulfill its obligation to Cerberus and that such failure constitutes a breach of the lease.

Having affirmed the finding of breach of the Canal Square-Cerberus lease, we turn to a discussion of Cerberus' recovery for that breach. The trial judge specifically found:

The provisions of Article Twenty-two of the Lease authorize and entitle Tenant to perform Landlord's obligations under

---

11. We recognize that Article 26B refers to adequate construction and insulation and does not expressly confer upon Canal Square an obligation to control the noise or its source. However, the trial court's finding of such an obligation is supported by the fact that Canal Square was aware, at the time its lease with Cerberus was signed, of Cerberus' paramount concern that there be no noise interference from any prospective adjoining restaurant tenant. The record, as already recounted in this opinion, is replete with manifestations of Canal Square's awareness in this regard, and reasonably permits the conclusion that there was an implicit contractual obligation on Canal Square's part to take all necessary steps to ensure that Cerberus' enjoyment of the leased premises would be free of noise interference. The last sentence of Article 26B expressly provided: "Landlord agrees that such construction and insulation are essential for the tenants' use of the demised premises." Once it was discovered that Canal Square had failed to provide adequate insulation against noise as it had promised to do, it was reasonable, as the trial court found, for Cerberus to expect Canal Square to meet its obligation by controlling the noise or its source. We see no reason to disturb this finding.

the Lease and to be reimbursed for its expenses incurred in so doing, said reimbursements to be in the form of set-offs, against accruing rents and any other sums due from Tenant to Landlord or to be paid directly to Tenant by Landlord at Tenant's option.

However, Article 22 does not specify the type of "expenses" a tenant might incur in performing the landlord's obligations under the lease, nor does it limit the tenant in choosing a way to perform those landlord obligations. The provision reads:

Landlord agrees that in the event of Landlord's failure to pay any sum or sums which Landlord is obligated to pay, the non-payment of which may result in a charge or encumbrance upon the demised premises, or in the event of Landlord's failure to perform any of Landlord's obligations hereunder, Tenant, in addition to any other rights it may have in law or in equity, shall have the right after thirty (30) days' prior written notice from Tenant to Landlord, to make payment of such sums or to perform such obligations, and thereupon Landlord agrees to reimburse Tenant for such sums, together with legal interest thereon until the same are repaid to Tenant, and Tenant shall have the right to receive an assignment of the claim of any payee against Landlord and shall have the further right to set-off against accruing rents or other sums payable to Landlord for such payment or expenditures made by Tenant, holding Landlord liable for any [excess] of such payments or expenditures over any amounts set-off against accruing

rents and other sums, provided, however, the foregoing right of Tenant to set-off against accruing rents or other sums payable to Landlord shall be enforceable only against Landlord and its successors and assigns, but shall not apply to the holder of any mortgage or deed of trust on Landlord's interest or any of its successors or assigns which may acquire the Landlord's interest by virtue of a foreclosure of a mortgage or deed of trust.

In the instant case, the expenses incurred in performing Canal Square's obligations consisted of attorneys' fees, acoustical experts' fees, employees' time, court costs, and miscellaneous expenses. Canal Square challenges the attorneys' fees award.

■ The "American Rule" on attorneys' fees provides that lacking a contractual obligation "the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser." *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975). *See also 1901 Wyoming Avenue Cooperative Association v. Lee,* D.C.App., 345 A.2d 456 (1975); *F. W. Berens Sales Co. v. McKinney,* D.C.App., 310 A.2d 601 (1973).[12]

■ A valid contract provision, however, can authorize an attorneys' fees award, *Williams v. Tencher-Walker, Inc.,* D.C.Mun. App., 125 A.2d 58, 60 (1956); *Shipley v. Major,* D.C.Mun.App., 44 A.2d 540, 541 (1945); *Wolf v. Cohen,* 126 U.S.App.D.C. 423, 426, 379 F.2d 477, 480 (1967), and we must decide whether Article 22 of the Canal Square-Cerberus lease is such a provision.[13]

---

**12.** Exceptions exist to the American Rule in addition to a contract provision exception, but those exceptions are not relevant in the instant case. *See generally F. W. Berens Sales Co. v. McKinney, supra* at 602–03; *Continental Ins. Co. v. Lynham,* D.C.App., 293 A.2d 481 (1972); *Van Senden v. Wilkinson,* 64 U.S.App.D.C. 174, 76 F.2d 151 (1935); *Fletcher v. Coomes,* 52 U.S.App.D.C. 159, 285 F. 893 (1922).

Nor are we faced with a situation where a plaintiff is claiming as damages in a breach situation the litigation expenses he incurred in a suit with a third party where such suit was caused by defendant's breach. *See Murphy v.*

*O'Donnell,* D.C.Mun.App., 63 A.2d 340, 342 (1948); *Freed v. Travelers,* 300 F.2d 395, 399 (7th Cir. 1962); *Vaughan v. Atkinson,* 291 F.2d 813, 815 (4th Cir. 1961), *rev'd on other grounds,* 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962), *on remand,* 206 F.Supp. 575 (E.D.Va. 1962); *Artvale, Inc. v. Rugby Fabrics Corp.,* 232 F.Supp. 814, 825–27 (S.D.N.Y.1964), *aff'd,* 363 F.2d 1002 (2nd Cir. 1966); Corbin on Contracts § 1037, at 191, 199 (1951).

**13.** There is no doubt that the award of attorneys' fees in the instant case is grounded in the contractual provision. Sundown's attorney asked the trial judge

That is to say, is the $60,000 a "sum," "payment," or "expenditure" which the landlord was obligated to pay because, as Cerberus claims, it had to perform the landlord's obligations under the lease and incurred those expenses in so performing?

Canal Square contends that Article 22 is a "fairly typical clause," a "repair and deduct" clause, which does not incorporate liability for the action taken here. It further asserts that

> if immediate action were required to protect the premises, Cerberus could have, under a proper interpretation of Article 22, contracted for and paid for physical repairs and improvements to the leasehold to satisfy the claimed requirements of Article 26B.

Cerberus, on the other hand, points out that when it attempted to do just that, early in its tenancy, it was denied permission to enter the restaurant by both Sundown and Canal Square. Cerberus further contends that when the restaurant suddenly began using a loud rock band legal action was its only recourse, particularly in light of its earlier futile attempts to prevent noise interference from Sundown.

We note that Article 22 is a nonrestrictive reimbursement provision which does not limit how Cerberus could perform Canal Square's obligations under the lease once Canal Square defaulted. Nor does the provision specify that certain types of expenses, even if incurred in performing Canal Square's obligations, might not be reimbursable. Thus the import of the provision is that Cerberus is assured that the contracted for obligations will be performed, even if it must perform them itself and be reimbursed. In that sense, the provision is comparable to a surety arrangement: Canal Square assured Cerberus that it would perform its obligations, but, if it defaulted, it would reimburse Cerberus for performing those obligations.

In *Massachusetts Bonding & Insurance Co. v. Lentz,* 40 Ariz. 46, 9 P.2d 408 (1932), a case involving a surety bond for construction work, the contract provision came into play when the principal failed to perform what he had obligated himself to do. The court held that the contract language "save harmless . . . from all costs and damage" which appellee might suffer because of the principal's default could include "a reasonable fee" for an attorney. *Id.* at 54, 9 P.2d at 410–11. That fee was incurred as a direct result of the principal's default and properly an item of "cost" or "damage" under the contract. *Id.* To the same effect is *W. Horace Williams Co. v. Vandaveer, Brown & Stoy,* 84 S.W.2d 333 (Tex.Civ.App. 1935), which involved a construction contract performance bond provision. The court held that the contract language, "should the obligees be put to any expense for enforcement of the contract [in the event of the principal's nonperformance]," would permit the award of a reasonable attorneys' fee for the attorney who had to prosecute a suit under the contract. *See generally City of Grandview v. Hudson,* 377 F.2d 694 (8th Cir. 1967); *Mundy v. Knutson Construction Co.,* 156 Tex. 211, 294 S.W.2d 371 (1956).

Although there are cases in which the courts required a contract covering "all damages" or "all expenses" to specifically mention attorneys' fees or suits or litigation before an award of attorneys' fees would be covered by the contractual provision, *see, e. g., Washington Aluminum Co. v. Pittman Construction Co.,* 383 F.2d 798 (5th Cir.

---

whether these attorneys' fees are being claimed by way of some agreement between the parties that such would be the case, or whether they are being claimed under the equitable provisions which are contained in exceptional circumstance[s] and discretion under the decisional law that I have researched.

The trial judge responded, "that provisions of Article 22 authorized the tenant to perform the landlord's obligation under the lease agreement [as well as] to be reimbursed for expenses incurred by it, and that those include expenses of litigation." The trial judge reiterated his rationale in the following exchange:

[Sundown's Counsel]: But you have specifically ruled that some item of attorneys' fees is recoverable, and it is recoverable because of the pre-existing agreement and not because of a conduct.

THE COURT: That is correct.

1967); *Fausett Builders, Inc. v. Globe Indemnity Co.*, 220 Ark. 301, 247 S.W.2d 469 (1952); *Alexander v. Fidelity & Casualty Co.*, 232 Miss. 629, 100 So.2d 347 (1958); *Federal Surety Co. v. Basin Construction Co.*, 91 Mont. 114, 5 P.2d 775 (1931), we find more persuasive and more logical the cases permitting recovery of attorneys' fees under an "all expenses" provision when, as here, a party has been compelled to perform another's obligations and no restrictions have been placed on how that performance is to be accomplished.

■ In light of Canal Square's failure to perform its soundproofing obligations under the lease, or to timely and effectively stop the rock music, we hold that the legal action taken by Cerberus was reasonable and appropriate. Accordingly, we affirm the trial court's judgment that the amount so expended by Cerberus was reimbursable under Article 22 of the lease.

## II.

We turn now to the remaining issue in this three-party appeal, an issue as to whether Sundown breached its lease with Canal Square. The issue initially involves a question of parol evidence. The relevant lease article, "Use of Leased Premises" [Art. 6], provides that Sundown would be "operating . . . a restaurant business with liquor service and entertainment." Our concern is whether parol evidence was properly admitted to define the word "entertainment."

■ While it is well settled that parol evidence is not admissible to vary or alter the terms of a written document, "it is admissible to explain those terms when there is an ambiguity in the language of an agreement." *Trans World Airlines, Inc. v. World Wide Airlines, Inc.*, D.C.App., 206 A.2d 821, 823 (1965). *Accord, Insurance Management of Washington, Inc. v. Guthrie*, D.C.App., 310 A.2d 61, 63 (1973). It is also established that terms of an agreement " 'are not rendered ambiguous by the mere fact that the parties do not agree upon their proper construction'." *Burbridge v. Howard University*, D.C.App., 305 A.2d 245,

247 (1973), *quoting Dixon v. Wilson*, D.C. App., 192 A.2d 289, 291 (1963), *quoting Friedman v. Thomas J. Fisher & Co.*, D.C. Mun.App., 88 A.2d 321, 323 (1952). Whether such an ambiguity exists is a question of law to be decided by the court. *Dixon v. Wilson, supra* at 291.

We agree with the analysis in *Burbridge v. Howard University, supra* at 247, *quoting* 17A C.J.S. *Contracts* § 294, at 34–35 (1968), that a written document

is ambiguous when, and only when, it is, or the provisions in controversy are, reasonably or fairly susceptible of different constructions or interpretations, or of two or more different meanings, and it is not ambiguous where the court can determine its meaning without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends
. . . .

■ In the instant case, the word "entertainment" in the lease, in the trial judge's view, could have two or more different meanings. We agree and therefore hold that there was ambiguity in the lease and that parol evidence was properly admitted to clarify it and "to show what the actual intent of the parties was at the time of executing [the lease]." *Smart v. Nevins*, D.C.App., 298 A.2d 217, 219 (1972). According to the trial court the parol evidence established that, at the time the lease was signed, the parties intended that Sundown's business would be a "family style restaurant without live entertainment," or, at the most, a family style restaurant with background music only. We cannot say that the court's conclusion is plainly wrong or without evidence to support it. D.C.Code 1973, § 17–305. Consequently, we hold that the trial court correctly concluded that Sundown breached its lease with Canal Square by having loud, live entertainment at its restaurant and "that such performance was without the scope of permitted entertainment."

■ The measure of damages for breach of a lease are those damages which are a

natural consequence and proximate result of the breaching party's conduct. *Meyers v. Antone,* D.C.App., 227 A.2d 56, 58 (1967). Moreover, those damages either could arise naturally, that is according to the usual course of things from the breach itself, or could reasonably have been in contemplation of both parties when they made the contract. *Sears, Roebuck & Co. v. Goudie,* D.C.App., 290 A.2d 826, 832, *cert. denied,* 409 U.S. 1049, 93 S.Ct. 523, 34 L.Ed.2d 501 (1972).

■ In the instant case, the trial judge specifically found that Sundown knew about the potential problem of sound interference with the theater tenant and that it agreed with Canal Square that only background music would be used in the restaurant. He further found that the damages thus flowing from Sundown's breach were those expenditures for which Canal Square was obligated to reimburse the interfered-with theater tenant:

> The Court having previously awarded the sum of $60,000.00 to Cerberus Theatres, Inc. in this action as damages against Canal Square Associates, that sum of $60,000.00 should be, and is, awarded to Canal Square Associates as damages for breach of the lease agreement by Sundown.[14]

In view of our conclusion that but for Sundown's breach this entire obligation would have been avoided by Canal Square, it necessarily follows that the amount of damages assessed against Sundown in favor of Canal Square was proper and, accordingly, is affirmed.[15]

**14.** The trial court did not improperly order that Sundown "indemnify" Canal Square as appellant Sundown suggests. The trial judge's use of the word "indemnity" read in the context of all his conclusions leads us to conclude that the damages, while dependent on the amount of the Cerberus recovery, were properly awarded as a consequence of Sundown's breach.

**15.** Another issue raised by appellant Sundown requires only brief comment. James Haight, general manager of Sundown, Inc., contends that the trial court erred in awarding a personal judgment against him. This argument was never raised to the trial court, nor did Haight assert this defense to personal liability under

### III.

Finding no reversible error in the award of possession, back rent, and unpaid utilities in Canal Square's favor against Sundown, we affirm that judgment.

In all respects, the judgments appealed from are

*Affirmed.*

REILLY, Chief Judge, Retired, concurring specially:

Were it not for a trial court finding[1] that appellant (landlord) in No. 9501 refused the theatre tenant (plaintiff below) permission to enter the restaurant for the purpose of constructing whatever soundproofing insulation was necessary, I would be inclined to reverse so much of the judgment for damages as included attorneys fees—a substantial portion thereof. But this finding, unchallenged on appeal, is tantamount to a determination that the landlord prevented the tenant from exercising its rights under Article 22 of the lease executed by Canal Square and Cerberus Theatres.

Had it not been for this interference, I think it clear under the only two relevant provisions of the lease, Article 22 (right of tenant to perform defaulted obligations of landlord upon 30 days notice), and Article 26B (agreement to provide adequate construction and insulation to prevent noise or odors emanating from the restaurant from penetrating to the theatre level), that the only remedy conferred upon the tenant by this instrument (once it became apparent

Super.Ct.Civ.R. 8(c) (Affirmative Defenses) or 9(a) (Pleading Special Matters—Capacity). We decline to consider the issue raised for the first time on appeal. *See Order of AHEPA v. Travel Consultants, Inc.,* D.C.App., 367 A.2d 119, 126 (1976).

**1.** Finding No. 10 (R. 0113–0114) reads as follows:

> Prior to the opening of the restaurant, Tenant sought permission to enter the restaurant and itself install the acoustical barriers required to protect the theater from sound interference. Neither the restaurant nor the Landlord would give the required permission.

that the materials used in the construction of the restaurant were inadequate to protect the theatre programs from noise intrusion) was to erect acoustical barriers in the ceiling below the theatre and to charge the expense incurred to the landlord as a set-off against its rental obligation. It is not enough to say that an equally or perhaps a more practical alternative remedy available to the theatre was to bring a suit to enjoin the restaurant from violating its oral agreement with the landlord which prohibited live or amplified music. Of course, the theatre did have this right as a matter of law, but there is nothing in the text of the lease that gave it the right to charge the cost of such a suit to the landlord. Article 22—the reimbursement clause—plainly refers only to such obligations as the landlord undertook in the lease itself, viz., (1) the payment of whatever debts were necessary to prevent the tenant's premises from being encumbered by liens, and (2) certain construction, maintenance (including the installation of soundproofing under Article 26B), and other warranties expressly set forth in other written provisions of that instrument. Hence, a holding that the reimbursement provisions of Article 22—which come into play only when the tenant at its own expense performs an obligation of the landlord—also apply to the cost of remedies (in this case the lawsuit) not within the terms and conditions of the lease, seems to me the imposition of an additional obligation never intended by the signatory parties.[2]

The provisions of Article 22, which permitted the tenant to contract for specified structural improvements at the landlord's expense when the latter failed to install them, are not unusual in the negotiation of leases in newly constructed office buildings with tenants who propose to occupy an entire floor. Such arrangements are generally regarded as mutually advantageous. Even though the tenant is allowed to bill the landlord for whatever sum he pays to the contractors of his choice, the landlord

benefits, for any improvements or repairs to the property revert to him at the expiration of the lease. In contrast, the "alternative" remedy obtained by the tenant in this case conferred no long-term benefit upon the landlord, as the restaurant company against whom the injunction was issued is no longer a tenant and the premises still lack a soundproof ceiling. Thus, from the standpoint of the lessor, the difference between the contracted for remedy and the one resorted to by the lessee was a very real one.

Unless it can be held, as I have suggested, that the legal effect of the landlord's deterring plaintiff from invoking its right to repair and deduct effected a novation in the lease contract, appellant is correct in contending that the judgment for damages of $60,000 for legal fees and expenses should be set aside.

This is crucial to the disposition of the case on appeal. The majority opinion recognizes that under decisions by which we are bound a prevailing party in an action at law or equity is not entitled—in the absence of contract or statute—to recover fees paid to its attorney. *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 247, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). *See also 1901 Wyoming Avenue Cooperative Association v. Lee,* D.C.App., 345 A.2d 456 (1975); *F. W. Berens Sales Co. v. McKinney,* D.C.App., 310 A.2d 601 (1973).

The majority opinion, however, takes the position that even though reimbursement for attorneys' fees was not expressly authorized by Article 22 of the lease, such fees were nevertheless recoverable because such provision is comparable to a surety arrangement. The difficulty with this premise is that in the absence of explicit wording in a surety contract—and the contracts in three of the four state cases cited by the majority contain such language—a surety is not liable for the legal expenses incurred by a creditor in prosecuting an action to recover

---

2. At the time the theatre lease was signed by the parties, the lower floor was unoccupied. Thus, the agreement with the restaurant lessee did not exist when the lease to plaintiff was executed and therefore any duty to enforce it could not possibly have been within the contemplation of the parties to the first lease as one of "the Landlord's obligations thereunder."

payment, even though the statute requiring the payment bond confers a "right to sue . . . for the amount . . . unpaid . . . and to prosecute said action to final execution and judgment for the sum or sums justly due him . . . ." [3] *F. D. Rich Co. v. United States for the Use of Industrial Lumber Co.,* 417 U.S. 116, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974). There are no words in Article 22 of the lease which even remotely suggest that the costs of a lawsuit and attorneys' fees were reimbursable.