**PHENIX–GEORGETOWN, INC.,**
Appellant,

v.

**CHAS. H. TOMPKINS CO., Appellee.**

**No. 83–599.**

District of Columbia Court of Appeals.

Argued Jan. 31, 1984.

Decided May 15, 1984.

Ronald G. Precup, Washington, D.C., with whom Lucien Hilmer, Washington, D.C., was on the brief for appellant.

Jack Rephan, Washington, D.C., with whom Joanne Dekker, Washington, D.C., was on the brief for appellee.

Before FERREN, TERRY and ROGERS, Associate Judges.

ROGERS, Associate Judge:

Phenix-Georgetown, Inc. (Phenix) appeals the granting of summary judgment in favor of Chas. H. Tompkins, Inc. (Tompkins) on Phenix's third-party complaint against Tompkins seeking breach of contract damages for losses suffered by Phenix, as lessor, when it was sued by its tenant, Weissbard & Fields, P.C. (Weissbard). Weissbard sued Phenix to recover damages for breach of lease conditions, particularly Phenix's failure to provide adequate air conditioning, and constructive eviction. Phenix asserts on appeal that there are genuine issues of material fact outstanding between itself and Tompkins which render summary judgment inappropriate. Tompkins replies that there are no such issues and that as a matter of law Phenix is not entitled to any such damages. After review of the record, we reverse and remand.

### I.

The record indicates Phenix entered into a contract with Tompkins in 1977 for its services as construction manager to oversee the construction of a mixed-use real estate complex called Prospect Place on property owned by Phenix in the District of Columbia. The contract[1] required Tomp-

---

**1.** The contract, executed on July 14, 1977, consisted of three separate documents: excerpts from AIA General Conditions (hereinafter General Conditions), and Associated General Con- tractors of America Document No. 8 (hereinafter AGC Article) and the "Agreement" which provided that the entire contract, including all its documents, represented an integrated agree-

kins to "supervise and direct the work using his best skill and attention", to be "solely responsible for all construction means, methods, techniques, sequences and procedures and for coordinating all portions of the work under the contract", and to warrant that "all work will be of good quality, free from faults and defects and in conformance with the contract documents" (General Conditions 4.3.1 and 4.5.1). Tompkins hired R.E. Anderson Co. (Anderson) to install the air conditioning system. Under the contract, Tompkins was responsible to the owner (Phenix) for acts and omissions of all persons performing under the contract and for inspecting all of Anderson's work to guard the owner against defects (General Condition 4.10 and AGC Article 2.1.13).

Weissbard, a law firm, rented office space on the third floor at Prospect Place for a five-year term, and took possession after issuance of a certificate of occupancy on October 12, 1979. On the same date Phenix conditionally accepted the mechanical equipment, including the air conditioning system, installed by Anderson. In a letter to Tompkins, Phenix acknowledged its responsibility from that date on for servicing the equipment, but noted that its acceptance was subject to completion of the contract, final inspection,[2] start-up [3] and submission of a "punchlist." [4] On January 25, 1980, Tompkins and the owner's architect, Metcalf Associates (Metcalf), certified the Prospect Place project as being substantially complete in accordance with the contract; [5] the certificate provided that an attached list of incomplete or unsatisfactory items did not alter Tompkins' responsibility to complete all work in accordance with the contract.

During the first summer of its tenancy, Weissbard complained to Phenix about inadequate air conditioning.[6] The Prospect Place property manager, Begg, Inc. (Begg), also advised Phenix, by letter of August 13, 1980, about an air conditioning problem in an office and on the third floor of the office building and asked what course of action Phenix wished to pursue.[7] Phenix forwarded Begg's letter to the architect, Metcalf, with a cover letter, dated August 19, 1980, asking whether the air conditioning problem should be corrected by Tompkins, Anderson, or Williard, Inc., the maintenance contractor. Phenix's letter stated the problems arose from either improper equipment installation or malfunction, and

ment. Accordingly, we construe the contract as an integrated document. 4 WILLISTON ON CONTRACTS § 618 (3rd Ed.1961). Under the contract terms, the law of the District of Columbia applies.

**2.** Under AGC Article 2.1.19, Tompkins had the duty to determine final completion of the project and to provide written notice to the owner (Phenix) and the architect (Metcalf) that the project was ready for final inspection.

**3.** AGC Article 2.1.18 defines "start-up" as "With the Owner's maintenance personnel, [construction manager (Tompkins) shall] direct the checkout of utilities, operations systems and equipment for readiness and assist in their initial start-up and testing by the Trade Contractors."

**4.** A "punch-list" was submitted to Tompkins by the owner's architect, Metcalf Associates, on October 26, 1979, listing minor corrections which were required in the mechanical system; no corrections were noted with respect to the air conditioning equipment in the offices later oc-

cupied by Weissbard. Tompkins claims "punch-list" items are not in the nature of defective conditions, but items requiring minor adjustments. The term "punch-list" is not defined in the contract or elsewhere in the record before us.

**5.** Under AGC Article 2.1.17, Tompkins had the duty to determine substantial completion and to prepare for the architect (Metcalf) a list of incomplete or unsatisfactory items and a schedule for their completion.

**6.** Paragraph 8c of the lease between Weissbard and Phenix required Phenix to furnish utilities, including air conditioning.

**7.** Begg noted that a full service maintenance contract on the air conditioning with Williard, Inc. covered all equipment, and that a copy of the letter had been sent to Anderson. Begg's letter listed five equipment dysfunctions. Relevant here is Begg's statement: "4. One office and the third floor of the office building does not receive cool air (all vents are open)."

copies (enclosing Begg's August 13 letter) were sent to Tompkins and Anderson.[8] On August 29, 1980, Tompkins received a letter from Anderson acknowledging receipt of Begg's August 13 letter and informing Tompkins that Anderson would check the air conditioning complaint.[9]

At approximately the same time, the architect's mechanical engineer indicated that corrections were required in the balancing of the system. Metcalf's mechanical engineer, Glassman-LeReche (Glassman), had designed the system and Anderson's subcontractor, Comfort Control, Inc., had balanced it and submitted a report to Glassman for approval in May 1980. On August 28, 1980, Metcalf notified Tompkins that Glassman had disapproved Comfort Control's balance report, and Tompkins instructed Anderson, on September 3, 1980, to review the report and take "immediate appropriate corrective action."[10] Accordingly, Anderson notified Comfort Control, which thereafter made several adjustments to the air conditioning system.[11] Tompkins asserts it heard nothing further about the air conditioning system until it was served with Phenix's third party complaint on September 3, 1982.[12]

Tompkins received final payment of the contract price from Phenix on October 23, 1980.[13] On November 25, Tompkins re-

8. Phenix's letter of August 19, 1980, to Metcalf read in full:

August 19, 1980.
Mr. Hal Davis,
Metcalf and Associates,
3222 N Street N.W.,
Washington, D.C. 20007.
Dear Mr. Davis:
 I am enclosing a letter from our property manager on improper equipment installation or malfunction. This is one of the reasons our electric bill was over $6,900 for 28 days last month.
 Should you wish Willard [sic] to correct the five items in lieu of either Tompkins, Anderson or both, please advise at your earliest convenience.
Very truly yours,
Geoffrey W. Dowling
Leasing Coordinator.
GWD/km
enclosure
cc: Mr. C.K. Greenwald –4 [Phenix's president]
Mr. J.W. Mann, Tompkins & Co. Washington, D.C.
 (attachment)
Mr. T. Edmundson, R.E. Anderson & Co.
 (attachment)

9. Anderson advised Tompkins, by letter of August 25, 1980, that it would check the complaint but could not believe the entire third floor was not receiving air conditioning and thought the complaint was confined to one office. Tompkins also admits receiving the August 13 and 19, 1980 letters (Affidavit of J.W. Mann, Vice President of Tompkins).

10. Glassman's letter to Metcalf disapproving the balance report was dated August 13, 1980, and Metcalf's letter to Tompkins was dated August 25, 1980 (Affidavit of Louis Hager, an employee of Comfort Control). We cannot determine from the record whether the correspondence regarding the balance report was undertaken independently of the correspondence regarding Weissbard's complaint, although the time frame of the two sets of correspondence is the same.

11. Although Tompkins advised Anderson that Glassman wanted the balance report to be resubmitted after the corrections were made, this was not done because, according to Comfort Control, Glassman had supervised and approved the adjustments. Comfort Control described its activities as follows: in September 1980, "changed the fan drive, reduced the fan speed, checked the static pressure, rpm and amperage for the system and took sound readings on the fifth floor." In July 1982, the system was "found to be low on static pressure and the static controller was reset to meet the design criteria indicated on the contract drawings. Various outlets on the third floor were also tested and found to be within design requirements."

12. Other than Weissbard's allegations in its lawsuit against Phenix, the record is silent regarding the functioning of the air conditioning system during the summer of 1981.

13. The exact date of final completion does not appear in the record. A handwritten notation on Exhibit H to Tompkins' memorandum in support of its motion to dismiss or, alternatively, for summary judgment, states "copy of final check from Phenix-Georgetown issued 10–23–80. On 10–22–80 Chas. H. Tompkins Co. gave Phenix-Georgetown the Release of Liens & Claims. No list of items to be completed was given because the job was accepted completely." The release of claims and liens was required by General Condition 9.7.3 prior to final payment.

ceived from the architect, Metcalf, a "punchlist" of corrections to be made under the equipment warranty; corrections were noted above the heating and air cut-off systems, but none related to air conditioning problems in the office complex.

Shortly after Weissbard sued Phenix for breach of lease conditions and constructive eviction,[14] Phenix retained an engineering firm to investigate Weissbard's complaint. On July 26, 1982, Philip Derrig, director of engineering at W.R. Wehrs & Associates, Inc., inspected the mechanical system design and installation at Prospect Place and found that the air ducts had been improperly installed. He concluded that "improper installation of those ducts was one of the main causes of the inadequate air conditioning." (Affidavit of Philip Derrig). Phenix claimed this was its first notice, except for "punch-list" items, that the mechanical system had been improperly installed. (Affidavit of Charles Greenwald, President of Phenix). Derrig's subsequent inspection revealed similar problems with the air ducts throughout the third floor of the office building. He concluded that repair would require breaking through the ceiling and, after reviewing Comfort Control's balance report (which had been disapproved by Glassman), that the readings in the report could not have been actual readings due to the improper installation. Phenix thereafter sued Tompkins to recover any damages it might have to pay to Weissbard on the grounds that Tompkins had breached its contract with Phenix, resulting in faulty workmanship on the project.

In response to Phenix's third party complaint, Tompkins filed a motion to dismiss or alternatively for summary judgment.[15] The motion to dismiss for failure to state a claim upon which relief could be granted, Super.Ct.Civ.R. 12(b)(6), asserted that (1) Phenix's third party complaint was fatally defective under Super.Ct.Civ.R. 14 because it did not allege a direct line of liability between Phenix and Tompkins which was independent of that between Phenix and Weissbard;[16] (2) Phenix's alleged damages were consequential damages not foreseeable by Tompkins and thus not recoverable by Phenix; and (3) Phenix did not have a cause of action for indemnity under the terms of the contract. Tompkins' motion for summary judgment, Super.Ct.Civ.R. 56; asserted that there was no genuine issue of material fact and that Tompkins was therefore entitled to judgment because (1) Phenix, by accepting the work and making final payment, waived any defects in construction; and (2) Tompkins never received timely written notice of faulty or defective work as required by the contract.[17] Phenix opposed the motion, alleging that among the genuine issues were: (1) whether the defect in the air conditioning was latent, and thus not waived by final payment to Tompkins for the project; and (2) whether Phenix knew or should have known of the defect when its mechanical design engineer (Glassman) rejected the balance report and subsequent corrective work was performed by Tompkins' sub-subcontractor (Comfort

14. The lawsuit was initially filed in the United States District Court for the District of Columbia on June 16, 1982, but dismissed for lack of diversity jurisdiction. *Weissbard & Fields, P.C. v. Phenix-Georgetown, Inc.*, No. 82–1683 (D.D.C. July 30, 1982). It was refiled on August 5, 1982, in the District of Columbia Superior Court.

15. While the motions were pending, Phenix settled its suit with Weissbard.

16. *See Moorehead Construction Co., Inc. v. City of Grand Forks,* 508 F.2d 1008, 1012 (8th Cir. 1975) ("The fundamental principle of third party practice is that in order to maintain a third party complaint, a direct line of liability must be alleged to exist between the third party plaintiff and third party defendant independent of that between the first party plaintiff and defendant"). *See infra* note 32.

17. *See infra* note 22. In support of the motions, Tompkins submitted affidavits of its vice president, James Mann, and Louis Hager, an employee of Comfort Control; the contract with Phenix; a statement of material facts as to which there was no genuine issue; and correspondence, including the previously discussed letter between the parties.

Control).[18] The motions judge requested, on January 31, 1983, supplemental memoranda on the issue of Phenix's right to indemnity, and on May 2, 1983, Tompkins' motion for summary judgment was granted; the court did not specify the grounds for granting the motion for summary judgment and did not rule on the Rule 12(b)(6) motion. It is from this order that Phenix appeals.

## II.

■ Summary judgment is properly granted only when the pleadings and other materials on file demonstrate that no genuine issue of material fact remains for trial, and that the movant is entitled to judgment as a matter of law. *McCoy v. Quadrangle Development Corp.*, 470 A.2d 1256 (D.C. 1983); *Burch v. Amsterdam Corp.*, 366 A.2d 1079, 1083–84 (D.C.1976).[19] To be successful, the moving party has the burden of demonstrating the absence of any material factual issue. *Nader v. de Toledano*, 408 A.2d 31, 42 (D.C.1979) ("If evidence would *permit* the factfinder to hold for the non-moving party under the appropriate burden of proof [which varies with the nature of the civil action being litigated], the motion for summary judgment should be denied."). The party opposing the motion need only show that there is sufficient evidence supporting the claimed factual issue to require a jury to resolve the parties' differing versions of the truth. *Franklin Investment Co., Inc. v. Huffman*, 393 A.2d 119, 122 (D.C.1978). On review of summary judgment the appellate court makes an independent review of the record, and its standard of review is the same as that of the trial court in initially considering the motion. *Holland v. Hannan*, 456 A.2d 807, 814–15 (D.C.1983).[20] Further, the party opposing the motion is entitled to the benefit of all favorable inferences that can be drawn from the record. *Id.; Murphy v. Army Distaff Foundation, Inc.*, 458 A.2d 61, 62 (D.C.1983).

■ We have reviewed the pleadings, memoranda, affidavits and exhibits upon which the trial court granted summary judgment for appellee Tompkins. Upon our independent review of the record, we cannot agree that Tompkins was entitled to judgment as a matter of law. Phenix presented sufficient evidence to create an issue of fact regarding whether or not the alleged defect was latent (which might entitle it to recover for the defect despite final payment and occupancy), and also whether or not it knew or should have known of the alleged defect. Further, contrary to Tompkins' contention, the terms of the parties' contract do not preclude Phenix's third party complaint, which, we hold, states a cause of action for the recovery sought.

Tompkins asserted in its motion for summary judgment that the record left no doubt that Phenix had waived its right to recover for any defective performance because Phenix accepted all of the work of Tompkins and its trade contractor (Anderson), occupied the premises and made final payment for the work. Phenix opposed the motion on the ground that it did not know

---

**18.** Phenix submitted affidavits of its president, Charles Greenwald, and Philip Derrig of Wehrs, regarding inspection and discovery of the allegedly defective air conditioning.

**19.** Super.Ct.Civ.R. 56(c), Summary Judgment, provides in relevant part:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

**20.** Tompkins argued that under Super.Ct.Civ.R. 52(a), Findings by the Court, Effect, the trial court's grant of summary judgment is to be upheld unless its decision is clearly erroneous and the prevailing party is entitled to have all inferences drawn in its favor. This is an incorrect statement of the law. Rule 52(a) applies to cases tried on the facts to the court sitting without a jury, and provides that findings are unnecessary in a summary judgment proceeding, which is not a case tried upon the facts, but a determination that the record does not present a fact to be tried. *McCoy, supra,* 470 A.2d at 1259.

of the alleged defect when it made final payment and thus could not, and did not, waive its right to recover for defective work.

The general rule is that where defects in the work of construction of a building are known or readily discoverable by the purchasers of the property, and no complaint about the quality of the work is promptly made by them, their acceptance of the property discharges any right to damages which they might have had for the defects. *Kandalis v. Paul Pet Construction Co.,* 210 Md. 319, 323, 123 A.2d 345, 347 (1956); *Elliott Consolidated School District v. Busboom,* 227 F.Supp. 858, 861 (S.D.Iowa 1964). The necessary corollary of this rule is that there is no waiver of defective performance under a construction contract where a defect is latent and not reasonably discoverable by inspection. *Clear v. Patterson,* 80 N.M. 654, 656, 459 P.2d 358, 360 (1969); *Kaminer Construction Corp. v. United States,* 488 F.2d 980, 984, 203 Ct.Cl. 182 (1973). Thus, the rule presents a question of notice, and the fact that a purchaser takes possession when a building is completed does not necessarily constitute a waiver of defects or an acceptance of the contractor's workmanship. *Kandalis v. Paul Pet Construction Co., supra,* 210 Md. at 323, 123 A.2d at 347. Whether or not an owner has accepted defective performance is generally a question of fact, 5 WILLISTON ON CONTRACTS § 724 (3d Ed. 1961),[21] as is the latent or patent character

of a defect. *Kaminer Construction Corp. v. United States, supra,* 488 F.2d at 985.

According to Phenix the benefit of all favorable inferences from the record reveals that a material issue was raised regarding whether Phenix knew, or should have known, of the alleged defect when it made final payment to Tompkins and hence, whether final payment constituted waiver of any defective performance by Tompkins. The record reveals that two months before Phenix's final payment to Tompkins, Anderson, which installed the air conditioning system, indicated it would check out the complaint about air conditioning on the third floor. The record also indicates that Anderson's subcontractor, Comfort Control, undertook corrective work on the air conditioning system around the same time because its balance report had been rejected by Glassman. Further, the record indicates that Phenix promptly sent Tompkins a copy of the August 13 and 19 letters reciting the complaints about the air conditioning.[22] Since these events occurred around the same time, Phenix could reasonably have believed, having heard nothing further, that Tompkins had checked the air conditioning to identify and correct any installation or malfunction problems prior to releasing its claims and liens against the subcontractors, as required before receiving final payment.[23] Phenix could also have reasonably believed that the air conditioning problems described by Begg resulted from the same problems which led Glassman to reject the balance report.[24] The balancing corrections

---

**21.** WILLISTON ON CONTRACTS, *supra,* § 724:

An acceptance of the work or structure, as in compliance with the contract, will ordinarily constitute a waiver of a full performance or defective performance of a building contract, and such acceptance may be expressed or implied from the conduct of the owner. Whether or not his acts amount to an acceptance is generally a question of fact depending on all the circumstances of the case.

**22.** The general contract contained two notice provisions. AGC Article 3.6 required the owner to give prompt written notice to the construction manager if the owner became aware of any defect or fault in the project or nonconfor-

mance with the contract documents. General Condition 13.2.2 required the contractor to correct any defective work found within one year of the date of substantial completion, or such longer period as may be prescribed by law, after written notice to do so from the owner, unless the owner had previously accepted any such defective work in writing.

**23.** General Condition 9.7.3, *supra* note 13 and *infra* note 29.

**24.** This is a favorable inference from the affidavit of Phenix's president, stating that the Wehr report was Phenix's first notice of improper

undertaken by Comfort Control could thereby have suggested to Phenix that all was well with the air conditioning; the Hager affidavit, which was placed in the record by Tompkins, states that Comfort Control's corrections in September satisfactorily addressed Glassman's concerns. In any event, the contract required a change order, with a corresponding price adjustment, to reflect acceptance by the owner of defective or nonconforming work (General Condition 13.3.1), and the absence of a change order or any reference to one in the record before us, supports an inference that Phenix could reasonably have believed the problems had been corrected before final payment.

Tompkins' contention that it was bypassed by Phenix when Glassman, the designer of the mechanical system, directed corrections to the balancing of the air conditioning system in September 1980, is to no avail. On the record before us, Tompkins remained responsible under the contract, at least until the time of final payment, for the work of the trade contractor (Anderson) and the sub-contractor (Comfort Control). (General Conditions 4.10.1 and 9.4.4; AGC Article 2.1.7).[25] The contract required Tompkins to monitor and coordinate the work of the trade contractor and the subcontractors with the activities and responsibilities of the owner and the architect (AGC Article 2.1.7), as well as to inspect the work of its trade contractors to guard Phenix from defects and deficiencies in the work. (AGC Article 2.1.13).[26] Defective work or work not conforming to the contract was to be promptly corrected by Tompkins whether observed before or after substantial completion; this included installed and completed work. (General Condition 13.2.1). Tompkins admits it received

the August 13 and 19 letters, and the Derrig affidavit indicated that a first inspection of the air conditioning system would have revealed the kinked air ducts. This was a defect involving installation, not design or maintenance, and, at the critical time at issue, Tompkins' trade contractor and sub-contractor were inspecting the air conditioning system.[27]

Accordingly, Tompkins' contention that it did not remain obligated for inspection and supervision prior to final payment in October 1980 is not supported by the record before us, and thus we cannot conclude that Glassman's directions to Comfort Control relieved Tompkins of its contract obligations. Phenix's conditional acceptance of the air conditioning system in 1979 did not relieve Tompkins of its contract obligations, and was subject to final inspection. Anderson's letter of August 25, 1980 to Tompkins and Tompkins' September 3, 1980 instruction to Anderson to correct the problem following Glassman's rejection of the balance report, are consistent with Tompkins' contract responsibilities and the inference that Tompkins considered itself so obligated at the time. For all of these reasons, Phenix could reasonably have relied on Tompkins' fulfillment of its contractual duties, as well as the absence of further complaint in September and October 1980, as evidence that the problems with the air conditioning had been corrected. *Elliott Consolidated School District v. Bushboom, supra,* 227 F.Supp. at 862, (citing RESTATEMENT OF TORTS § 426 (general contractor is responsible to owner for acts of subcontractor which affect the results which the general contractor is under duty to achieve for owner)).

---

25. General Condition 5.1.3 provided that the contract did not create a contractual relationship between the owner, or architect, and any of the sub-contractors or sub-subcontractors.

installation, in view of the reference by its leasing coordinator, in his letter of August 19, 1980, to an installation or malfunction problem. *See supra* note 8.

26. The contract included a provision that subcontractual agreements were to protect the owner's rights (General Condition 5.3.1).

27. Both parties conceded at oral argument that if the air ducts were "kinked," that condition would have existed in the summer of 1980.

Final payment by Phenix under these circumstances strengthens the reasonable inference that Phenix believed that Tompkins had determined that Anderson's investigation and Comfort Control's remedial work were sufficient to correct the reported problems with the air conditioning system. *Cf. D.M. Picton & Co., Inc. v. Estes,* 160 F.2d 189, 194 (5th Cir.), *cert. denied,* 331 U.S. 859, 67 S.Ct. 1756, 91 L.Ed. 1866 (1947) (in action for indemnity against contractor who failed to remove all underwater pilings it had contracted to remove, causing damage to boat for which owner of pilings sought indemnity, payment of contract price not a defense where there was no proof owner knew any pilings remained in water when it paid contractor). The contract between the parties provides that payment and occupancy by Phenix would not constitute a waiver of any defective performance by Tompkins (General Condition 9.4.4).[28] Further, on the record before us, it would be unreasonable to conclude that an owner of commercial property in the District of Columbia would knowingly accept a defective air conditioning system without a price adjustment or any right to recover for damages for such defects where the alleged defect may have been latent. *Cf. Houston Fire & Casualty Insurance Co. v. Riesel Independent School District,* 375 S.W.2d 323, 325 (Tex.Civ.App.1964) (whether defect in school building construction appeared within one year after final acceptance immaterial to right of school district to recover on theory that contractor had breached agreement to perform work in good workmanlike manner).

Thus, factual issues arise from this record regarding Phenix's knowledge and assumptions about the air conditioning problems and the inspection and remedial work undertaken by Tompkins' subcontractors. These issues include whether Tompkins did or should have inspected Anderson's and Comfort Control's work prior to accepting final payment, and whether Phenix knew that the problems with the air conditioning were due to defective installation and accepted less than complete job performance when it made final payment in October 1980.[29] The affidavits of Derrig and Hager clearly indicate the existence of a genuine issue regarding the cause of Weissbard's air conditioning problem, and causation is normally a question for the trier of fact. *McCoy v. Quadrangle, supra,* 470 A.2d at 1259 (citing *Munsey v. Webb,* 37 App.D.C. 185, 188 (1911), *aff'd.,* 231 U.S. 150, 34 S.Ct. 44, 58 L.Ed. 162 (1913)). Hence, summary judgment on this issue was inappropriate.

### III.

Finally, Tompkins contends that Phenix has failed to state a cause of action on which it can recover its damages to Weissbard. On summary judgment, "the showing of a 'genuine issue for trial' is predicated upon the existence of a legal theory which remains usable under the asserted version of the facts, and which would entitle the party opposing the motion (assuming his version to be true) to a judgment as a matter of law." *Nader v. de Toledano, supra,* 408 A.2d at 48 (quoting *McGuire v. Columbia Broadcasting System, Inc.,* 399 F.2d 902, 905 (9th Cir.1968), *cert. denied,*

---

**28.** Under General Condition 9.7.6, acceptance of final payment by Tompkins constituted a waiver of all its claims except for those previously made in writing. AGC Article II specified additional conditions for receipt of final payment and allowed the owner to retain 150% of the estimated cost of any minor unfinished items. Nothing in the contract provided that the owner's (Phenix's) payment constituted a similar waiver.

**29.** Tompkins also asserts that it was entitled to summary judgment because it did not receive timely notice, within one year of substantial completion, of any alleged defect. Assuming this to be true, we disagree that this was a proper ground on which to grant summary judgment. Because the record before us creates an issue regarding the latent or patent nature of the defect, the issue of notice within one year of substantial completion need not be considered in determining Tompkins' entitlement to summary judgment.

444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980) and cases cited therein).

 The terms of the contract do not preclude Phenix's third party complaint and Tompkins concedes that Phenix may recover for breach of contract since payment of the contract price is not a defense to a breach of contract. *D.M. Picton & Co. v. Estes, supra,* 160 F.2d at 194; *Houston Fire & Casualty Co. v. Reisel Independent School District, supra,* 375 S.W.2d at 325. General Condition 7.6.1 provides that the rights and remedies available to the parties are in addition to and not a limitation of any rights and remedies available by law.[30] Were Phenix barred from recovering for breach of contract for a latent, nondiscoverable defect more than one year after substantial completion, General Condition 7.6.1 would be superfluous language; the general rule is that contracts will be read as a whole, and every part will be interpreted with reference to the whole. 4 WILLISTON ON CONTRACTS, *supra,* § 618. *See Board of Regents v. Wilson,* 27 Ill. App.3d 26, 32, 326 N.E.2d 216, 220 (1975) (contract clauses providing that contractor, upon notice from owner and within one year after final payment, was to correct defect in construction, was not exclusive remedy and plaintiff was not barred from asserting claims other than those arising within specified one year). Moreover, to the extent Tompkins knew about the air conditioning problems and either did nothing to assure their correction or failed to advise Phenix of any problem at the time

of final payment for the project, Phenix would not be prevented from recovery, upon proper proof, for latent defects or fraud irrespective of contract provisions. *Elliott Consolidated School District v. Busboom, supra,* 227 F.Supp. at 861 (under certain circumstances, concealment of defects in work will be held to constitute "legal fraud", and a defense to waiver of damages by final payment).

 Tompkins nonetheless asserts that Phenix cannot recover the damages it suffered by payment to Weissbard because such damages were not reasonably foreseeable consequences of any breach by Tompkins of its contract with Phenix.[31] While we agree that the damages which are normally recoverable in actions for breach of contract are those which arise directly from the breach itself, or could reasonably have been in contemplation of both parties when they made the contract, *Sundown, Inc. v. Canal Square Associates,* 390 A.2d 421, 433 (D.C.1978); *Sears, Roebuck & Co. v. Goudie,* 290 A.2d 826, 832 (D.C.), *cert. denied,* 409 U.S. 1049, 93 S.Ct. 523, 34 L.Ed.2d 501 (1972), we disagree that this was a proper ground for granting Tompkins' motion for summary judgment.

 Appellee's contentions here relate to the measure of damages. Although Phenix measured its damages according to what it would have to pay Weissbard, its third party complaint was for breach of contract. In essence, Phenix claimed that but for Tompkins' breach of its contractual

---

**30.** The statute of limitations for a cause of action alleging breach of contract is three years. D.C.Code § 12–301(7) (1981). AGC Article 2.1.-8.1 requires Tompkins to maintain records on all the work for three years after final payment.

**31.** Tompkins' claim that Phenix's third party complaint was fatally defective under Rule 14, because Phenix did not allege a direct line of liability between Phenix and Tompkins independent of that between Phenix and Weissbard, is without merit. *See* 6 *Wright and Miller Fed. Prac. & Proc.* Civil § 1442 (1971) (third party claims are proper when the third party's liabili-

ty is in some way dependent on the outcome of the main claim). See also *National Mutual Insurance Co. v. Liberty Mutual Insurance Co.,* 90 U.S.App.D.C. 362, 363, 196 F.2d 597, 598, *cert. denied,* 344 U.S. 819, 73 S.Ct. 15, 97 L.Ed. 638 (1952), noting that Rule 14, as amended, allows a defendant (Phenix) to serve a third party complaint only upon a person (Tompkins) who is or may be liable to him (Phenix) for all or part of the plaintiff's (Weissbard's) claim against him (Phenix) (citing 3 MOORE'S FEDERAL PRAC. & PROC. Civil § 405 *et seq.* (2d Ed.1948)).

duties, the faulty workmanship in the installation of the air conditioning system would not have occurred. Liberally construing Phenix's complaint,[32] Phenix alleged that the damages which it incurred to Weissbard were essentially losses of business income and use of the building.[33] This court has previously held that construction contractors who know that a building will be used for particular business purposes should reasonably contemplate that a breach of contract in providing adequate air conditioning will result in loss of business income or profits in the operation of the business, and thus liability may extend therefor. *Sears, Roebuck & Co. v. Goudie, supra,* 290 A.2d at 832–33. Further, if a trial did in fact prove that Phenix's liability to Weissbard was the consequence of Tompkins' breach of contract, measuring the damages by the sum Phenix paid Weissbard would be appropriate. *See Sundown, Inc. v. Canal Square Associates, supra,* 390 A.2d at 433 (where landlord's liability to tenant A for breach of lease was due to tenant B's breach of its lease with same landlord, awarding landlord as damages against tenant B the sum landlord paid tenant A was proper).

◼ We are aware that the trial court may have viewed the third party complaint as one seeking only indemnity. Any judgment that Phenix was barred as a matter of law from recovery under such a theory was, however, erroneous. "Summary judgment would be appropriate if, considering all the evidence, appellants would be entitled to a directed verdict".[34] *International Underwriters, Inc. v. Boyle,* 365 A.2d 779, 783 (D.C.1976). There are two outstanding factual questions regarding Tompkins' completion of the work in accordance with the contract and Phenix's acceptance and waiver of defects. This court has noted in *Woodside Manor, Inc. v. Rose Brothers Co.,* 83 A.2d 325, 326 (D.C. 1951) that the non-liability of an independent contractor for defects in the work is based on completion of the work and acceptance by the owner. Tompkins insists that the instant case is controlled by *Woodside Manor, supra,* which held that an owner of property who had to pay damages to a tenant when a roof leaked in the tenant's apartment could not subsequently recover those damages from the subcontractor-roofing company. The court noted that after

> completion and acceptance of a building, the liability of the builder for accidents caused by defective construction ceases and the liability attaches to the owner. . . .

*Id.,* at 326. The case is not controlling, however, for it noted that there are exceptions to the rule. Although the court did not enumerate the exceptions, we have no doubt that the exception for latent defects

---

32. *Beacon Theatre, Inc. v. Westover,* 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959); *In re Boland,* 79 F.R.D. 665 (D.D.C.1978); *Mutual Creamery Ins. Co. v. Iowa National Mut. Ins. Co.,* 427 F.2d 504, 507–08 (8th Cir.1970) (pleadings construed favorably to pleader). Super.Ct. Civ.R. 8(f), Construction of Pleadings, provides "All pleadings shall be so construed as to do substantial justice."

33. Weissbard's complaint alleged that inadequate air conditioning had been provided since the inception of its lease, and that "[a]s a direct result of [Phenix's] failure to perform its obligation under the lease, the temperature ... in the summer months has often been in excess of 90 degrees fahrenheit, rendering the premises uninhabitable and grossly unfit for the use con-

templated by the parties." Phenix counterclaimed, alleging that Weissbard was in default of its lease, not having paid its monthly rent for June, July and August 1982, and, further, had committed an anticipatory breach of the rent covenant for the remaining term of the lease by its letter of June 4, 1982, advising that it did not intend to make further rental or other payments under the lease.

34. Tompkins asserts that Phenix's right to recover for indemnity is limited to damages resulting from bodily injuries and property damage, relying on AGC Article 12.1.1, in which Tompkins agreed to indemnify Phenix for bodily injury and property damage. The contract does not provide that this is Phenix's only remedy in indemnity (*see* General Condition 7.6.1).

is applicable. See 5 WILLISTON ON CONTRACTS, § 724 *supra* note 21, and cases cited therein; *Moorehead Construction Co., Inc. v. City of Grand Forks, supra,* 508 F.2d at 1012.

That the allegation by Phenix of a breach of contract as the cause of its damages may result in Tompkins being held liable to Phenix for the full amount of its damages to Weissbard does not prevent Tompkins from offering proof of Phenix's acceptance of the project as completed performance in October 1980 when it made final payment. *D.M. Picton & Co. v. Estes, supra,* 160 F.2d 189. Neither would it prevent Tompkins from proving Phenix's action or inactions in mitigation of some damages. While we hold as a matter of law that Phenix has stated a cause of action, we express no opinion on the merits of the claims of the parties, holding neither that the defect was latent or that Phenix knew or should have known about the defect, and express no view about the damages attributable to a breach, if any, of the contract by Tompkins or the loss of the use of the building; these issues remain for determination at trial. *McCoy v. Quadrangle, supra,* 470 A.2d at 1259.

Accordingly, since the record indicates that Phenix has presented genuine issues of fact and that there are legal theories on which Phenix could recover, depending upon its proof at trial, we reverse the award of summary judgment for Tompkins and remand for trial.